**FEDERAL TRADE COMMISSION**

v.

**INVENTION SUBMISSION
CORPORATION,
Appellant.**

**No. 91–5174.**

United States Court of Appeals,
District of Columbia Circuit.

Argued March 9, 1992.

Decided June 2, 1992.

Rehearing En Banc Denied Aug. 4, 1992.

Edward B. Friedman, with whom Arnold M. Friedman, Pittsburgh, Pa., Michael M. Eaton, Vienna, Va., and Lewis Rose, Washington, D.C., were on the brief, for appellant.

Joanne L. Levine, Attorney, F.T.C., with whom James M. Spears, Gen. Counsel, Jay C. Shaffer, Deputy Gen. Counsel, and Ernest J. Isenstadt, Asst. Gen. Counsel, Washington, D.C., were on the brief, for appellee.

Before: MIKVA, Chief Judge, SILBERMAN and STEPHEN F. WILLIAMS, Circuit Judges.

Opinion for the Court filed by Circuit Judge SILBERMAN.

SILBERMAN, Circuit Judge:

Appellant Invention Submission Corporation (ISC) challenges a district court order enforcing two civil investigative demands (CIDs), or administrative subpoenas, issued by the Federal Trade Commission in the course of an investigation into possible unfair or deceptive trade practices. ISC contends that financial data sought by the Commission is irrelevant to the inquiry and that disclosure of other information would be "unduly burdensome" to its business operations. Appellant also contests the district court's denial of its discovery motion. We affirm.

I.

ISC is in the business of promoting other people's inventions. For a fee, it prepares "basic information packages" describing clients' inventions or ideas and submits those packages to companies in its "data bank" that might be interested in the new products. It also produces a catalog and runs an invention trade show.

After several state attorneys general and Better Business Bureaus received consumer complaints, the FTC began an investigation of ISC for possible violations of section 5(a)(1) of the Federal Trade Commission Act, 15 U.S.C. § 45(a)(1). When the corporation refused to comply with certain requests for information, the Commission issued a resolution authorizing the use of compulsory process. The resolution stated that the investigation's purpose was

[t]o determine whether Invention Submission Corporation ... may be engaged in unfair or deceptive acts or practices ... including but not limited to false or misleading representations made in connection with the advertising, offering for sale and sale of its services relating to the promotion of inventions or ideas ... [and] to determine whether Commission action to obtain redress of injury to consumers or others would be in the public interest.

Pursuant to 15 U.S.C. § 57b–1(c)(1), which authorizes the FTC to issue CIDs for information "relevant" to possible section 5 violations, the Commission then sought from ISC, *inter alia*, financial data—including balance sheets, income statements, records reflecting annual gross sales, and information concerning the financial status of each ISC regional office—and the names and addresses of clients, advertisers, and the companies listed in the corporation's data bank.

The corporation petitioned the Commission to limit or quash the CIDs as irrelevant and unreasonable. In accordance with Commission rules, *see* 16 C.F.R. § 2.7(d)(4), the petition was considered by a single Commissioner, Terry Calvani. Commissioner Calvani modified the CIDs in certain respects to make ISC's compliance easier, *see In re Invention Submission Corp.*, File No. 882–3060, at 5–8 (Sept. 25, 1989), but he rejected the corporation's other objections. He determined that the requested financial information was relevant to the FTC's investigation because the information might reveal "evidence of a possible profit motive for the alleged misrepresentations." *Id.* at 11–12. He also rejected ISC's claim that identification of its clients, advertisers, and data bank participants would be "unduly burdensome"—ISC's theory was that those contacted would assume the corporation had committed wrongdoing and would cease doing business with it— and therefore declined to impose any restrictions on the Commission's communications with those entities. *Id.* at 3–5. Full Commission review of Commissioner Calvani's ruling was denied. *See In re Inven-*

*tion Submission Corp.*, File No. 882–3060 (Oct. 10, 1989).

When ISC failed to respond satisfactorily to the modified CIDs, the Commission petitioned the district court for enforcement. *See* 15 U.S.C. § 57b–1(e). The corporation sought discovery, or, alternatively, an evidentiary hearing, to prove that certain specifications were overbroad. It alleged that FTC staff had indicated, in statements to the Commission and the court, that the scope of the investigation was confined to possible "oral misrepresentations" by ISC salespeople and that some of the information requested was irrelevant to that specific purpose. The court enforced the CIDs without expressly ruling on the discovery request. It disposed of the basis for that motion, however, by holding that "[w]hen a conflict exists in the parties' understanding of the purpose of an agency's investigations, the language of the agency's resolution," rather than subsequent representations of Commission staff, controls. *FTC v. Invention Submission Corp.*, 1991–1 Trade Cas. (CCH) ¶ 69,338, at 65,351 (D.D.C. Feb. 13, 1991). Because the FTC's compulsory process resolution defined the investigation's purposes broadly, the court concluded that all of the material still being withheld—including, implicitly, the financial information—was relevant to the Commission's inquiry. *See id.* at 65,351–52. The court also declined to restrict communications with potential witnesses. The Commission had asserted that it did not intend to contact most of the corporation's clients or data bank participants, that it had no present intention of contacting advertisers (though this might become necessary as the investigation developed), and that it would state in interviews that it was only "investigating the idea promotions industry generally." *Id.* at 65,352–53; *see also id.* at 65,352 n. 24. The court thought such representations should allay ISC's fears. *See id.* at 65,353.

█ ISC moved to modify the court's order to require expressly that the Commission adhere to those assurances, and a Commission attorney reiterated them in writing. The corporation then dismissed

its motion and complied with the CIDs, while reserving its right to challenge the district court's decision.[1]

## II.

### A.

■ It is well established that a district court must enforce a federal agency's investigative subpoena if the information sought is " 'reasonably relevant,' " *FTC v. Texaco, Inc.*, 555 F.2d 862, 872, 873 n. 23 (D.C.Cir.) (en banc) (quoting *United States v. Morton Salt Co.*, 338 U.S. 632, 652, 70 S.Ct. 357, 368, 94 L.Ed. 401 (1950)), *cert. denied*, 431 U.S. 974, 97 S.Ct. 2940, 53 L.Ed.2d 1072 (1977)—or, put differently, " 'not plainly incompetent or irrelevant to any lawful purpose' of the [agency]," *id.* at 872 (quoting *Endicott Johnson Corp. v. Perkins*, 317 U.S. 501, 509, 63 S.Ct. 339, 343, 87 L.Ed. 424 (1943)); *accord United States v. Aero Mayflower Transit Co.*, 831 F.2d 1142, 1145 (D.C.Cir.1987)—and not "unduly burdensome" to produce, *Texaco*, 555 F.2d at 881. We have said that the agency's own appraisal of relevancy must be accepted so long as it is not " 'obviously wrong.' " *FTC v. Carter*, 636 F.2d 781, 787–88 (D.C.Cir.1980) (quoting *Texaco*, 555 F.2d at 877 n. 32).

■ That is not to suggest that the agency's internal determination of relevance is independently reviewable. The agency, in issuing a subpoena, has undertaken no final administrative action; a subpoena becomes an appealable final order only after the subpoenaed party refuses to comply and the agency requests and receives judicial enforcement. *See Office of Thrift Supervision, Dep't of Treasury v. Dobbs*, 931 F.2d 956, 957 (D.C.Cir.1991). Thus, "[i]n a subpoena enforcement ..., the District Court can inquire into all relevant matters, unlimited by the scope of the agency's own inquiry, if any." *United States v. Exxon Corp.*, 628 F.2d 70, 77 (D.C.Cir.) (per curiam), *cert. denied*, 446

U.S. 964, 100 S.Ct. 2940, 64 L.Ed.2d 823 (1980). If the district court finds that the information sought by the agency is relevant, we will affirm unless that determination is " 'clearly erroneous.' " *FTC v. Anderson*, 631 F.2d 741, 746 (D.C.Cir.1979) (quoting *FTC v. Lonning*, 539 F.2d 202, 210 n. 14 (D.C.Cir.1976)).

ISC challenges the specifications requesting financial material as irrelevant to the Commission's investigation into possible section 5 violations. Appellant relies virtually exclusively on the Fifth Circuit's comment in *FTC v. Turner*, 609 F.2d 743 (5th Cir.1980), that "[t]he amount of [the subject's] assets is not relevant to an inquiry into whether a violation of the law exists." *Id.* at 745. This statement, however, is mere dictum for which the *Turner* court provided no explanation. The case presented the question whether the Commission, once it has issued a cease-and-desist order, can use an investigative subpoena to determine whether the respondent has sufficient resources to justify a civil damage action for consumer redress. Two judges on the panel agreed (over a strong dissent by Judge Brown) that, in those circumstances, the Commission, like a private plaintiff, "may not discover an opponent's assets until after a judgment against the opponent has been rendered." *Id.*

■ Here, the Commission has not yet even issued a complaint against ISC; we are thus not confronted with the narrow question decided by the Fifth Circuit— whether financial data can be obtained for the purpose of determining the feasibility of *redress*. And we agree with the district court, and other courts that have addressed the issue, *see FTC v. American Buyers' Network Inc.*, 1991–2 Trade Cas. ¶ 69,551 (D.Colo., Aug. 19, 1991); *FTC v. International Diamond Corp.*, No. C–81–29 MISC, Mem.Op. at 6 (N.D.Cal. Jan. 4, 1982), that financial information can be rel-

---

1. ISC's compliance does not moot the controversy. As the parties pointed out in their briefs, if the subpoena were improper, the Commission could be ordered to return responsive materials and to destroy any records derived from them.

*See, e.g., Office of Thrift Supervision, Dep't of Treasury v. Dobbs*, 931 F.2d 956, 958 (D.C.Cir. 1991); *FTC v. Compagnie de Saint–Gobain–Pont-a-Mousson*, 636 F.2d 1300, 1327 (D.C.Cir. 1980).

evant to a pre-complaint *investigation* into possible section 5 violations.

■ The standard for judging relevancy in an investigatory proceeding is more relaxed than in an adjudicatory one. At the investigatory stage, the Commission does not seek information necessary to prove specific charges; it merely has a suspicion that the law is being violated in some way and wants to determine whether or not to file a complaint. *See Texaco*, 555 F.2d at 872. The requested material, therefore, need only be relevant to the *investigation*—the boundary of which may be defined quite generally, *see Carter*, 636 F.2d at 787–88; *Texaco*, 555 F.2d at 874 & n. 26, as it was in the Commission's resolution here.

■ In light of this restricted judicial inquiry, the district court's conclusion that ISC's financial information was relevant to the Commission's inquiry surely was not clearly erroneous. Financial data, including evidence of relative profitability, could facilitate the Commission's investigation of ISC in different ways, not all of which may yet be apparent. Comparison of ISC's profits with those of other invention promotion companies, and of the revenues of the corporation's various regional sales offices with one another, for example, might help the Commission to allocate its limited investigative resources to protect the largest number of consumers from potential harm, *see Appeal of FTC Line of Business Report Litigation*, 595 F.2d 685, 702 (D.C.Cir.1978), as sales offices that used fraudulent techniques but generated little or no profit would likely be closed even without government intervention.

■ Of course, profitability in and of itself does not suggest wrongdoing. One could assume just as readily that evidence of *loss* would tend to show that a company had an added motive to engage in deceptive practices. Commissioner Calvani's puzzling statement concerning the relevance of "a possible profit motive," however, does not undermine the FTC's claim for judicial

enforcement of the CIDs. *Cf. SEC v. Chenery Corp.*, 318 U.S. 80, 87–88, 63 S.Ct. 454, 459, 87 L.Ed. 626 (1943). As we have already explained, the district court is not reviewing the internal determination of the agency.[2] And the Commission has no obligation to establish precisely the relevance of the material it seeks in an investigative subpoena by tying that material to a particular theory of violation. *See Texaco*, 555 F.2d at 877. In these sorts of cases, in light of the broad deference we afford the investigating agency, it is essentially the respondent's burden to show that the information is irrelevant. *Cf. id.* at 882 ("The burden of showing that the request is unreasonable is on the subpoenaed party."). Appellant did not meet this difficult standard.

■ ISC alternatively claims that the identification of its clients, advertisers, and data bank participants will prove unduly burdensome. An administrative subpoena may be deemed unduly burdensome if "compliance threatens to unduly disrupt or seriously hinder normal operations of a business." *Texaco*, 555 F.2d at 882. It is argued that unrestricted Commission contacts with potential witnesses will "place ISC under a cloud of suspicion and speculation," thereby jeopardizing the corporation's business relationships. The difficulty with ISC's argument is that it could be made with respect to almost any investigation.

■ Appellant therefore further refines its claim. It contends that the district court, when it enforced the specifications, relied on the Commission's assurances that communications would be limited and nonaccusatory, and therefore it should have incorporated those assurances into its order. A district court may "impose reasonable conditions and restrictions with respect to the production of the subpoenaed material if the demand is unduly burdensome." *Id.* at 881. But we do not think the district court erred when it did not

---

**2.** For similar reasons, enforcement of the specifications for financial information is not, as ISC contends, improper on the ground that the Commission may have followed *Turner* in a prior decision. *See In re Rome Finance Co.*, File No. 862–3090, at 3 (Mar. 25, 1988).

impose the restrictions sought here. It was within the court's discretion to decide whether to freeze the government's representations into an order (particularly since it is by no means obvious that the representations were required). As we have so often said, "agencies are entitled to a presumption of administrative regularity and good faith," and "[w]ith no indication that the Commission will act cavalierly or in bad faith," its assertions with respect to the treatment of subpoenaed material should be accepted at face value. *FTC v. Owens–Corning Fiberglas Corp.*, 626 F.2d 966, 975 (D.C.Cir.1980).[3] If appellant thought the Commission subsequently acted in bad faith, it could, of course, return to district court to seek appropriate relief.

### B.

■ ISC, as part of its effort to "try the prosecutor," asserts that it had a right, which the district court denied, to discovery (or an evidentiary hearing) to probe whether certain specifications exceeded the scope of the Commission's investigation. Such procedures are inappropriate in summary enforcement proceedings except in " 'extraordinary circumstances.' " *Carter*, 636 F.2d at 789 (quoting *Exxon*, 628 F.2d at 77 n. 7). The moving party must make an "adequate showing that the agency is acting in bad faith or for an improper purpose, such as harassment." *Aero Mayflower*, 831 F.2d at 1145; *see also SEC v. Dresser Indus., Inc.*, 628 F.2d 1368, 1388 (D.C.Cir.) (en banc), *cert. denied*, 449 U.S. 993, 101 S.Ct. 529, 66 L.Ed.2d 289 (1980).

Appellant contends it meets that standard because the Commission itself had limited its investigation to possible *oral* misrepresentations and therefore the identities of advertisers and data bank compa-

nies, which are unrelated to oral misrepresentations, were sought only to harass the corporation. It relies on several statements by Commission staff. FTC attorney Pamela Wood told Commissioner Calvani:

[I]f a salesperson said that an invention would be displayed at a trade show, he was wrong, and that was a misrepresentation. That's exactly the sort of misrepresentation which we feel is the crux of this case.

. . . . .

... [T]he thing[s] we feel ... most strongly about receiving in their entirety are the client lists with contact information and the employee lists with contact information because this is an oral misrepresentations case. There is very little question about that unless we find something we are not expecting to find.

And in a declaration submitted to the district court, Wood stated:

[T]he Commission began investigating ISC in 1988 to determine whether the company was engaged in unfair and deceptive business practices.... One focus of the investigation is whether ISC's sales representatives sold its services through oral representations that differed from or substantially exceeded the statements in ISC's advertisements and brochures.

She also submitted to the court a memorandum written to Commissioner Calvani stating the FTC's view that individual interviews, as opposed to a consumer survey, would be necessary "because we are investigating allegations of oral misrepresentations."

The Commission's compulsory process resolution did not restrict the investigation to possible oral misrepresentations, how-

---

**3.** Appellant makes a related First Amendment argument that unrestricted Commission contacts with its advertisers and data bank participants will lead those entities to suspect ISC of wrongdoing, which will cause them to cease doing business with the corporation, which will make it impossible for ISC to disseminate information about its services and about new inventions, which will have an impermissible chilling effect on the corporation's commercial speech rights. The district court characterized this argument as "far-flung," *Invention Submission Corp.*, 1991–1 Trade Cas. at 65,353 n. 26, and this seems to us generous. To state the argument is to show how attenuated it is. *Cf. University of Pennsylvania v. EEOC*, 493 U.S. 182, 199–200, 110 S.Ct. 577, 587–88, 107 L.Ed.2d 571 (1990). In any event, the harm ISC alleges will only occur if we presume that the Commission will not abide by its representations—which, as we said, we are unprepared to do.

ever, and we have previously made clear that "the validity of Commission subpoenas is to be measured against the purposes stated in the resolution, and not by reference to extraneous evidence." *Carter,* 636 F.2d at 789. Regardless, we do not think the statements demonstrate that the inquiry was in any sense narrowed. That oral misrepresentations were "[o]ne focus" of the investigation—even if Commission staff deemed such practices the "crux" of the case—does not mean that the Commission was investigating *only* oral misrepresentations. The possibility that evidence of other violations might emerge was explicitly recognized. Because ISC has not even approached a showing that the Commission acted in bad faith, the district court's denial of the discovery motion was not an abuse of discretion. *See id.*

\* \* \* \* \* \*

For the foregoing reasons, the enforcement order and the denial of ISC's discovery motion are affirmed.

*So ordered.*