RESOLUTION TRUST CORPORATION,
Appellee,

v.

William L. WALDE, Appellant.

RESOLUTION TRUST CORPORATION,
Appellee,

v.

Solomon F. SCHICK, John C.
Adams, et al., Appellants.

Nos. 92–5495, 93–5010 and 93–5011.

United States Court of Appeals,
District of Columbia Circuit.

Argued Sept. 14, 1993.

Decided March 22, 1994.

Thomas M. Buchanan, argued the cause and filed the briefs for appellant Walde in No. 92–5495.

Gregory A. Presnell, argued the cause for appellants John C. Adams, et al., in No. 93–5011. John M. Robertson, argued the cause for appellant Solomon F. Schick in No. 93–5010. With them on the joint briefs were, Gregory J. Kelly, Keith R. Mitnik, and David R. Kuney.

David M. Fitzgerald, argued both causes for appellee Resolution Trust Corp. With him on the briefs were John H. Korns, Paul M. Laurenza, and James E. Topinka.

944

Before BUCKLEY, GINSBURG, and HENDERSON, Circuit Judges.

Opinion for the court filed by Circuit Judge BUCKLEY.

BUCKLEY, Circuit Judge:

Former directors and officers of failed savings and loan institutions challenge district court decisions enforcing subpoenas *duces tecum* issued by the Resolution Trust Corporation ("RTC"). They object to those parts of the subpoenas that seek personal financial information. Appellant Solomon F. Schick also contends that his subpoena is now moot because the RTC has instigated civil proceedings against him. We affirm the district court rulings ordering enforcement of the subpoenas in all respects but one: We hold that the RTC does not have the authority to subpoena information for the sole purpose of determining the subpoenaed person's net worth. We also hold that the intervening filing of civil charges does not render the subpoena moot with respect to Mr. Schick.

## I. BACKGROUND

In the 1980s, the savings and loan industry was threatened by a deluge of insolvencies. As a consequence, the federal government was confronted with tens of billions of dollars in claims from depositors whose savings had been insured by the Federal Deposit Insurance Corporation ("FDIC"). To instill some semblance of order and limit the calls on the federal treasury, Congress created the RTC as part of the Financial Institutions Reform, Recovery, and Enforcement Act of 1989, Pub.L. No. 101–73, 103 Stat. 183 (codified as amended at 12 U.S.C. §§ 1441a, 1811 *et seq.* (West Supp.1993)) ("FIRREA").

Under this statute, the Director of the Office of Thrift Supervision ("OTS") may appoint the RTC as conservator of failed savings and loan institutions ("S & Ls"). 12 U.S.C. § 1821(c)(6)(A) (Supp. III 1991). The RTC is granted the same powers that Congress granted the FDIC under 12 U.S.C.A. §§ 1821–23. 12 U.S.C. § 1441a(b)(4)(A) (West Supp.1993). As conservator of a failed S & L, the RTC succeeds to all of its "rights,

titles, powers, and privileges." 12 U.S.C. § 1821(d)(2)(A) (Supp. III 1991).

In discharging its stewardship, the RTC is to "preserve and conserve the assets and property of such institution[s]." *Id.* § 1821(d)(2)(B)(iv). To these ends, it is empowered to avoid fraudulent asset transfers, 12 U.S.C.A. § 1821(d)(17) (West Supp.1993), assert claims against an S & L's directors and officers, 12 U.S.C. § 1821(k) (Supp. III 1991), seek a court order attaching assets, 12 U.S.C.A. § 1821(d)(18) (West Supp.1993), and issue administrative subpoenas *duces tecum*, 12 U.S.C. § 1821(d)(2)(I) (Supp. III 1991) (authorizing RTC to employ powers listed in 12 U.S.C. § 1818(n)).

In 1974, William Walde founded Trustbank Savings, F.S.B., and subsequently served it as President, Chief Executive Officer, Chairman of the Board, and director. Mr. Walde's career with the company ended on January 25, 1991, when the OTS declared Trustbank insolvent and appointed the RTC as its conservator. The RTC launched an investigation, still ongoing, into whether Mr. Walde and other former Trustbank officials might be liable to the RTC as a result of their operation of the company. The agency's "Amended Order of Investigation" states that its purpose is to determine whether

(1) former officers, directors and others who provided services to, or otherwise dealt with, Trustbank ... may be liable as a result of any actions, or failures to act, in connection with or which may have affected Trustbank ...; (2) the RTC should seek to avoid a transfer of any interests or an incurrence of any obligations; (3) the RTC should seek an attachment of assets; and (4) pursuit of such litigation would be cost-effective, considering the extent of the potential defendant's ability to pay a judgment in any such litigation.

Amended Order of Investigation, September 11, 1992, Joint Appendix ("J.A.") at 17–A.

On November 30, 1992, the RTC served a subpoena *duces tecum* on Mr. Walde calling for the production of "[a]ny and all documents in your possession, custody or control for the years 1975 through the present that reflect, refer or relate to the operations or management of Trustbank...." J.A. at

64A–65A. The subpoena also sought extensive personal financial information, namely:

3. Any and all documents in your possession, custody or control that reflect, refer or relate to any real and/or personal property interests having a value of $5,000, or more, per person or organization per year, in which you, or anyone acting on your behalf, or under your control or influence, have had any interest at anytime during the past five years, including, but not limited to, documents reflecting, referring or relating to the following:

a. personal financial statements;

b. state and federal tax returns;

c. bank records, including joint accounts held by or with your spouse or children (both foreign and domestic, including bank statements, cash verification statements and cancelled checks);

d. partnership interests;

e. interests in any insurance policy;

f. trust accounts or other trust assets (including cash deposits, stocks and mutual funds and real property);

g. broker/dealer, financial advisor, or financial planner statements (including those related to stocks, bonds, mutual funds, pension plans or any other fund or security);

h. stocks, bonds options, or any other negotiable or non-negotiable instrument or security;

i. businesses, corporations, joint ventures, partnerships, Walde Enterprises, Walde Management, or any other entity in which you or anyone acting on your behalf owns or controls an interest (including bank records and cancelled checks of such entities);

j. inheritances, whether vested or contingent;

k. notes or other commercial paper;

l. IRA's, Keogh's, pension or profit sharing plans, annuities;

m. accounts receivable;

n. alimony, maintenance, support or property settlements;

o. real property in which you, or anyone acting on your behalf or under your control or influence, own an interest;

p. options or rights to purchase any interest in real property;

q. personal property in which you, or anyone acting on your behalf or under your control or influence, own any interest;

r. income from any other sources;

s. contingent interests in real or personal property;

t. employee, contractor or independent contractor relationships or involvement in any business enterprise;

u. any financial accounts and instruments held in your name or in your benefit, sold, closed or otherwise transferred in the past five years, both foreign and domestic (including: checking, savings, CD's or other instruments);

v. shares and share accounts held in banks, credit unions, pension funds, corporations, associations, brokerage houses and other financial institutions, including both domestic and foreign;

4. Any and all documents in your possession, custody or control that reflect, refer or relate to any financial, real or personal property transactions or transfers in which you, or anyone acting on your behalf, or under your control or influence, have been involved during the past five years, except as the attorney, employee or agent of another party on transactions in which you had no personal interest, having a value of $5,000 or more, per person or organization per year, including, but not limited to, documents reflecting, referring or relating to the following:

a. all real and personal property purchases, sales or transfers;

b. all trust participations;

c. mortgages, trusts or other liens on security interests obtained or supplied to any third party;

d. lawsuits; and

e. deposits and withdrawals in financial institutions, both foreign and domestic.

5. With respect to any trusts having assets with a value of $5,000 or more, for

which you, your spouse, your children or other relatives are beneficiaries or otherwise may receive distributions, any and all documents in your possession, custody or control that reflect, refer, or relate to:

    a.  any contributions to that trust within the past five years of assets having a value of $5,000 or more;

    b.  the beneficiaries and trustees of the trust;

    c.  the right to direct the distributions of that trust;

    d.  the assets of the trust; and

    e.  the identity or location of any assets of the trust having a value of $5,000 or more.

J.A. at 66A–70A. On the same day, the RTC filed a petition in district court to enforce this subpoena; and on December 9, 1992, the court ordered Mr. Walde to comply with it within sixty days. *RTC v. Walde*, Misc. No. 92–419, 1992 WL 448858 (D.D.C. Dec. 9, 1992). On February 5, 1993, we granted Mr. Walde's motion to stay the district court's order pending appeal.

The consolidated companion cases, *RTC v. Schick & Adams,* raise essentially the same issues. On May 25, 1990, the RTC was appointed conservator of American Pioneer Savings Bank, a Florida Chartered Stock Savings and Loan Association on whose board of directors the seven *Adams* appellants and Mr. Schick (collectively, "American Pioneer appellants") had served. The RTC issued an Order of Investigation on October 2, 1991, "to determine whether the former directors and officers for American Pioneer Savings Bank may be liable ..." to the RTC. As amended on August 9, 1992, the Order of Investigation is virtually identical to that issued in the case of Trustbank. Its purposes are to determine whether

    (1) [American Pioneer's former directors and officers] may be liable as a result of any actions, or failures to act, in connection with or which may have affected American Pioneer Savings Bank, or its successors; (2) pursuit of such litigation would be cost-effective ...; (3) the RTC should seek to avoid a transfer of any interests or an incurrence of any obligations; and (4) the RTC should seek an attachment of assets.

Amended Order of Investigation, August 9, 1992, J.A. at A5–21.

The RTC served subpoenas *duces tecum* on the American Pioneer appellants calling for the production of information relating to the management of American Pioneer and their personal financial affairs. These appellants, who had served American Pioneer as outside directors, refused to relinquish any personal financial information until the RTC presented evidence of wrongdoing on their part. On December 8, 1992, the RTC petitioned the district court to enforce the subpoenas. After a hearing, the court entered an order granting the RTC's petition and ordering immediate compliance with the subpoenas. *RTC v. Adams*, Misc. No. 92–492, 1993 WL 56177 (D.D.C. Jan. 15, 1993). On February 18, 1993, we granted the American Pioneer appellants' motion to stay the court's order pending appeal, 1993 WL 52614.

On appeal, Mr. Walde and the American Pioneer appellants challenge the district court's enforcement orders on two grounds: First, they maintain that the RTC does not have the statutory authority to subpoena personal financial information; second, they assert that enforcement of the subpoenas for the purpose of determining their net worth would violate their Fourth Amendment rights. Mr. Schick also maintains that when the RTC brought its civil action against him, his subpoena was mooted—his theory being that the filing of the suit marked the end of the RTC's investigation.

## II. DISCUSSION

An administrative subpoena must be enforced if the information sought "is within the authority of the agency, the demand is not too indefinite and the information sought is reasonably relevant." *United States v. Morton Salt Co.*, 338 U.S. 632, 652, 70 S.Ct. 357, 369, 94 L.Ed. 401 (1950). Moreover, we defer to the agency's appraisal of relevancy, which "must be accepted so long as it is not obviously wrong." *Federal Trade Comm'n v. Invention Submission Corp.*, 965 F.2d 1086, 1089 (D.C.Cir.1992) (internal quotation marks and citation omitted). Finally, "[i]f the district court finds that the information

sought by the agency is relevant, we will affirm unless that determination is clearly erroneous." *Id.* (internal quotation marks omitted). With this framework in place, we turn to the challenges raised by appellants.

## A. Statutory Authority

To determine whether the RTC has the statutory authority to subpoena the information at issue here, we must first determine whether the purposes set forth in the orders of investigation are sanctioned by FIRREA. If so, the next question is whether the various materials sought by the subpoenas are reasonably relevant to those purposes. In undertaking our analysis, we are mindful that "[t]he standard for judging relevancy in an investigatory proceeding is more relaxed than in an adjudicatory one.... The requested material, therefore, need only be relevant to the *investigation*—the boundary of which may be defined quite generally...." *Id.* at 1090 (emphasis in original; citations omitted).

The orders issued in these cases describe four areas of investigation: possible liability of former officers and directors, evidence of illegal asset transfers, identification of attachable assets, and the cost-effectiveness of litigation against prospective defendants. We discuss these in turn.

### 1. *Determining liability*

■ None of the appellants argues that the RTC lacks the authority to subpoena material reasonably relevant to the issue of liability. We find that some of the personal financial information sought under the subpoenas is reasonably relevant to the potential liability of officers and directors. Bank statements of officers and directors, for example, might reveal secret payments from individuals whose loans they had approved.

These subpoenas clearly cast a wider net, however, and we agree with appellants that not all of the information sought by the RTC is relevant to the issue of liability. Much as we strain our imagination, we cannot find any way in which alimony payments or irrevocable trusts that predate appellants' association with a failed S & L and to which no assets may be transferred are relevant to

whether appellants might be guilty of fraud, negligence, or breach of fiduciary duties. Nonetheless, this information may be relevant to the remaining purposes listed in the orders of investigation.

### 2. *Avoidable asset transfers and attachable assets*

■ The RTC may set aside asset transfers under 12 U.S.C.A. § 1821(d)(17) and apply to freeze assets pursuant to 12 U.S.C.A. § 1821(d)(18). Appellants contend, however, that the RTC must make a preliminary determination of liability before exercising either of these powers. The RTC's subpoena power is not so circumscribed. The Supreme Court has made clear that an agency's investigatory authority is far-reaching, analogous to that of a grand jury, which "can investigate merely on suspicion that the law is being violated, or even just because it wants assurance that it is not." *Morton Salt*, 338 U.S. at 642–43, 70 S.Ct. at 364. *See also United States v. Powell*, 379 U.S. 48, 57–58, 85 S.Ct. 248, 255, 13 L.Ed.2d 112 (1964) (Commissioner of the IRS not required to show probable cause before obtaining enforcement of summons). To require the RTC to make such a preliminary determination of liability before subpoenaing documents that might reveal, for example, the fraudulent transfer of S & L assets would seriously hamper the agency's ability to locate and save a failed institution's assets. *Cf. Resolution Trust Corp. v. Koch*, Misc. No. 93–003, 1993 WL 177736 (D.D.C. Feb. 17, 1993) (a sufficient "suspicion of .... the need for attachment of assets" may be founded "simply on the basis of Respondents' status as former directors of the failed savings institution").

Having concluded that the RTC is not required to make a preliminary determination of liability before subpoenaing information relevant to the attachment of assets or the avoidance of asset transfers, we must see whether the personal financial information sought is relevant to either of these purposes. *See Linde Thomson Langworthy Kohn & Van Dyke, P.C. v. Resolution Trust Corporation*, 5 F.3d 1508, 1516 (D.C.Cir. 1993). Once again, we are mindful that "in

light of the broad deference we afford the investigating agency, it is essentially the respondent's burden to show that the information is irrelevant." *Invention Submission,* 965 F.2d at 1090 (citation omitted). Appellants have satisfied us that at least some of the information sought under the subpoenas is not relevant to these two purposes. We again cite alimony payments as just one example. Thus we turn to the last of the objectives enumerated in the orders of investigation—a determination of the cost-effectiveness of litigation against potential defendants.

### 3. *Determining the cost-effectiveness of litigation*

■ In essence, the RTC asserts that as the conservator for a failed S & L, it is authorized to serve a subpoena on each former officer and director for the *sole* purpose of determining whether that individual has a sufficient net worth to warrant suing, even in the absence of any reason to believe he may be liable to the S & L. The RTC draws this conclusion from the sections of FIRREA that direct it to "minimize[ ] the amount of any loss realized in the resolution of cases," 12 U.S.C.A. § 1441a(b)(3)(C)(iv) (West Supp. 1993), and authorize it to "conserve the assets and property of [the failed] institution," 12 U.S.C. § 1821(d)(2)(B)(iv) (Supp. III 1991), and to use its subpoena authority "for purposes of carrying out any power, authority or duty with respect to an insured depository institution," *id.* § 1821(d)(2)(I)(i).

To the RTC, the sum of these sections is a congressional mandate to carry out its mission in a manner that minimizes the costs to the U.S. taxpayer, and it finds an assessment of the cost-effectiveness of potential litigation to be integral to this endeavor. *See* Transcript of Oral Argument in *Resolution Trust Corp. v. Walde* at 22–23 (counsel for RTC contending it has "[a]n obligation to conduct investigations in a cost-effective manner" by making "preliminary determinations about the potential sources of recovery so that we don't insert resources in investigations that are not warranted.").

As we are well aware, when a statute "is silent or ambiguous with respect to [a] specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Chevron U.S.A., Inc. v. Natural Resources Defense Council,* 467 U.S. 837, 843, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984) (footnote omitted). If it is, the court must defer to the agency's construction. *Id.* at 843–44, 104 S.Ct. at 2782. Here, the language and history of FIRREA offer no clues as to whether Congress intended to authorize the RTC to use its subpoena powers for the purpose of determining which of the possible targets of an investigation were sufficiently wealthy to warrant pursuit. Therefore, we must defer to the RTC's construction of the scope of its subpoena powers so long as it is permissible.

The RTC asserts that its interpretation is reasonable, citing our decision in *Invention Submission.* In that case, we suggested that the Federal Trade Commission could compare a corporation's profits "with those of other [similar] companies, and of the revenues of the corporation's various regional sales offices with one another, ... [so as to] help the Commission to allocate its limited investigative resources...." *Invention Submission,* 965 F.2d at 1090. That case, however, involved the subpoenaing of corporate rather than personal records.

The Supreme Court reminds us that "corporations can claim no equality with individuals in the enjoyment of a right to privacy." *Morton Salt,* 338 U.S. at 652, 70 S.Ct. at 368. That right extends to personal papers:

> [I]t cannot be too often repeated ... that the principles that embody the essence of constitutional liberty and security forbid all invasions on the part of the government and its employes of the sanctity of a man's home, and the privacies of his life.... [O]f all the rights of the citizen, few are of greater importance or more essential to his peace and happiness than the right of personal security, and that involves, not merely protection of his person from assault, *but exemption of his private affairs, books, and papers from the inspection and scrutiny of others.* Without the enjoyment of this right, all others would lose half their value.

*Interstate Commerce Comm'n v. Brimson*, 154 U.S. 447, 479, 14 S.Ct. 1125, 1134, 38 L.Ed. 1047 (1894) (citation and internal quotation marks omitted; emphasis added). In commenting on this right, Justice Holmes observed:

> Anyone who respects the spirit as well as the letter of the Fourth Amendment would be loath to believe that Congress intended to authorize one of its subordinate agencies to sweep all our traditions into the fire and to direct fishing expeditions into private papers on the possibility that they may disclose evidence of crime. We do not discuss the question whether it could do so if it tried, as nothing short of the most explicit language would induce us to attribute to Congress that intent.

*Federal Trade Comm'n v. American Tobacco Co.*, 264 U.S. 298, 305–06, 44 S.Ct. 336, 337, 68 L.Ed. 696 (1924) (citation omitted).

The RTC would no doubt remind us that the Court has traveled some distance since 1924, and that in defining the permissible scope of administrative subpoenas, the Supreme Court in *Morton Salt*, and we in *Invention Submission*, have permitted agencies the greatest latitude in seeking the information they deem relevant to their duties. We in turn, however, would remind the RTC that not only did those cases involve corporations rather than individuals, they dealt with the power to investigate suspicions of wrongdoing whereas in the cases now before us, the agency is attempting to subpoena information relevant to wealth rather than liability. This distinction leads squarely to the question of the reasonableness of the RTC's conclusion that in enacting FIRREA, majorities in each house of Congress intended to authorize the RTC to browse among the private papers of citizens whose only sin had been to serve as officers or directors of defunct S & Ls.

Because of the absence of any evidence that Congress intended so intrusive a grant of authority, and for the reasons stated by Justice Holmes, we conclude that it was not reasonable for the RTC to impute such an intent to Congress. Instead, we think that the RTC must have at least an articulable suspicion that a former officer or director is liable to the failed institution before a subpoena for his personal financial information may issue. Of course, in determining whether the RTC acted reasonably in issuing such a subpoena, the court must give "due weight ... to the specific reasonable inferences" that the RTC might draw from the information available to it in light of its experience investigating other failed institutions. *See Terry v. Ohio*, 392 U.S. 1, 27, 88 S.Ct. 1868, 1883, 20 L.Ed.2d 889 (1968).

Reasonable suspicion should not turn upon whether particular conduct is unlawful, but upon "the degree of suspicion that attaches to particular types of noncriminal acts." *Illinois v. Gates*, 462 U.S. 213, 243–44 n. 13, 103 S.Ct. 2317, 2335 n. 13, 76 L.Ed.2d 527 (1983). Thus, the RTC could found its suspicion of liability upon, for example, records of the failed institution showing a suspicious asset transfer or a questionable payment involving the target, or deposition testimony of other former officers and directors. If the RTC has no such specific basis, however, upon which to suspect that the target engaged in wrongdoing, then the subpoena cannot be enforced. We therefore hold that in cases such as these, where the RTC has no articulable suspicion to believe that the former officer or director is liable to an S & Ls in its custody, the RTC may not subpoena his personal financial information for the purpose of assessing the cost-effectiveness of prospective litigation.

Having found that the RTC does not have the authority to subpoena private financial information for the purpose of assessing an individual's net worth, we will not reach appellants' Fourth Amendment challenge.

B. Mootness of the Administrative Subpoena

Subsequent to the filing of the appeals in these cases, the RTC filed a civil suit against Mr. Schick in the United States District Court for the Middle District of Florida, Orlando Division, Case No. 93–389–CIV–ORL–18. Mr. Schick contends that this action mooted the subpoena that had been served on him because the instigation of the civil suit signaled that the RTC had terminated its investigation. We must disagree.

We recently held that the initiation of civil proceedings will not moot an administrative subpoena. *See Linde Thomson*, 5 F.3d at 1518 (filing of civil charges "in no way affects the continued vitality of the RTC's subpoena" because ongoing investigation might reveal information to underpin further charges). Moreover, Mr. Schick's concern that enforcement of the administrative subpoena would enable the RTC to bypass the discovery rules governing the civil case is properly addressed in the Florida proceeding. "If information is wrongly obtained through an administrative subpoena and used in a subsequent civil or criminal proceeding, the subpoenaed party remains free to challenge the use of the information in the appeal from *that* proceeding." *Office of Thrift Supervision v. Dobbs*, 931 F.2d 956, 959 (D.C.Cir. 1991) (emphasis in original).

### III. CONCLUSION

We conclude that the RTC has the authority to subpoena personal financial information that is relevant to each of the purposes of its orders of investigation save one: a determination of the cost-effectiveness of litigation based on an assessment of a prospective defendant's net worth. We also hold that the initiation of civil proceedings against Mr. Schick did not moot the subpoena that was served on him. Accordingly, we remand the enforcement orders to the district court with instructions to review the information sought by the RTC and to withhold enforcement as to any information that is not relevant to the lawful purposes of its orders of investigation.

*So ordered.*