**In re SEALED CASE
(ADMINISTRATIVE
SUBPOENA).**

No. 94–5004.

United States Court of Appeals,
District of Columbia Circuit.

Argued Oct. 21, 1994.

Decided Dec. 23, 1994.

■■■■■■■■■■■■■■■■

■■■■■■■■■■■■■■■■

Jessel Rothman, Mineola, NY, argued the cause for respondents-appellants.

Peter R. Maier, Atty., U.S. Dept. of Justice, Washington, DC, argued the cause for petitioner-appellee.

Before EDWARDS, Chief Judge, SENTELLE and TATEL, Circuit Judges.

Opinion for the Court filed by Circuit Judge TATEL.

TATEL, Circuit Judge:

In this case, we review a district court order enforcing two subpoenas *duces tecum* seeking personal financial documents issued by the Office of Thrift Supervision. We affirm the district court's order enforcing the subpoenas with respect to two of their stated purposes: determining personal benefit and assessing ability to pay a civil penalty. Because we hold that the subpoena's third purpose, to investigate "other wrongdoing, as yet unknown," is invalid, we vacate the order of the district court to the extent that it enforces this purpose and remand for a revised determination of relevance.

## I.

As part of its effort to stem the savings and loan crisis, Congress created the Office of Thrift Supervision ("OTS") within the Treasury Department in the Financial Institutions Reform, Recovery and Enforcement Act of 1989, Pub.L. No. 101–73, 103 Stat. 183 (codified as amended at 12 U.S.C. §§ 1441a, 1811 *et seq.* (1988 & Supp. V 1993)). The OTS is responsible "for the examination, safe and sound operation, and regulation of savings associations." 12 U.S.C. § 1463(a)(1) (Supp. V 1993). Its supervisory and enforcement powers derive from the Home Owners' Loan Act, 12 U.S.C. § 1461 *et seq.* (1988 & Supp. V 1993), and section 8 of the Federal

Deposit Insurance Act. 12 U.S.C. § 1811 *et seq.* (1988 & Supp. V 1993). Authorized to conduct examinations and investigations of federally-insured savings associations, the OTS may subpoena information relevant "to any matter in respect to the affairs or ownership of any [insured depository] bank or institution or affiliate." 12 U.S.C. § 1820(c) (Supp. V 1993); *see also* 12 U.S.C. §§ 1464(d)(1)(B)(v), 1818(n) (Supp. V 1993). The statutory definition of "institution-affiliated parties" in the Federal Deposit Insurance Act includes directors, officers and controlling shareholders. 12 U.S.C. § 1813(u) (Supp. V 1993). Upon discovering an insolvent thrift, the OTS may appoint the Resolution Trust Corporation ("RTC") as receiver or conservator of the failed institution. *See* 12 U.S.C. § 1821(c)(6)(A) (Supp. V 1993).

In 1986, one of the appellants acquired a controlling interest in a federally-insured, state-chartered savings association ("bank"). He served as an officer and director of the bank and the other appellant served as Chairman of the Board of Directors. At the time of the acquisition of the bank, a mortgage banking business wholly owned by appellants, and the law firm of one of the appellants, made large deposits into accounts at the bank. Appellants' control and operation of both the bank and mortgage company aroused the concern of state and federal regulators. As a result, in 1988, appellants shifted control over the daily management of the bank to a newly appointed president and Chairman of the Board of Directors. Appellants maintained their involvement as directors.

The OTS commenced a routine examination of the bank in October 1990. Discovering that the bank was nearly insolvent, it appointed the RTC as receiver in February 1991. The RTC subsequently sold the bank to another institution, effectively ending appellants' participation in the management of the bank. The OTS investigation also included the mortgage company, which was considered an "affiliate" of the bank because one of the appellants had common control of both institutions at the time the investigation commenced. *See* 12 U.S.C. § 1462(9) (Supp. V 1993). As a mortgage servicer, the mortgage

company collected and held funds in escrow accounts prior to disbursement on behalf of mortgagors to entities such as municipal taxing authorities and insurers.

The OTS investigation revealed an unusual practice: large overdrafts in the law firm deposit accounts were covered by overnight transfers from the mortgage company accounts and reversed the following day. According to the OTS, this practice suggested possible violations by appellants of fiduciary duties to the bank and the mortgage company and various violations of OTS regulations regarding loans to a single borrower, restrictions on loans to affiliated parties, and restrictions on overdrafts on accounts maintained by directors. *See* 12 C.F.R. § 563.93(d)(1) (1991); 12 C.F.R. § 563.43(b)(5) (1989); 12 U.S.C. § 375b (1988).

To pursue this irregularity, the OTS authorized a formal investigation into the affairs of the bank. On June 25, 1993, it issued an identical subpoena *duces tecum* to each appellant, seeking production of personal financial documents belonging to appellants, their spouses or "any entity owned or controlled by you or your spouse, or through which you or your spouse do business," including all financial statements, tax returns, all documents relating to bank accounts or other financial investments, and any other documents relating to assets, liabilities, income and expenditures for "the period June 30, 1990, to the present date." Joint Appendix (J.A.) at 21–22 & 33–34. It also required appellants to disclose any documents relating to transfer of assets over $1000 from "January 1, 1989, to the present date." *Id.* at 22–23 & 34–35.

Appellants refused to comply with the subpoena. After several fruitless exchanges, the OTS sought enforcement in district court. The OTS claimed three purposes for the subpoena: (1) "to determine whether either of [appellants] benefitted from the use of the escrow funds to cover the overdrafts ... at the Bank," (2) "to determine the extent of [appellants'] ability to pay civil money penalties," and (3) to determine whether "the information may reveal other wrongdoing, as yet unknown, in the transactions [appellants] and/or their affiliated businesses had with the Bank during their tenure as owner and directors of the Bank." Petition for Summary Enforcement of Administrative Subpoenas, Nov. 9, 1993, J.A. at 55. The district court found the information sought was reasonably relevant, not unduly burdensome and within the statutory authority of the OTS. *See* Order to Enforce Administrative Subpoenas, Dec. 21, 1993, J.A. at 119–20.

On appeal, appellants challenge the enforcement of the subpoenas, arguing that the OTS has not yet made a determination of liability, the documents sought are not reasonably relevant to the purposes of the subpoena, and the OTS's purpose of uncovering unknown wrongdoing is invalid. Underlying these arguments is the claim that privacy interests protected by the Fourth Amendment limit the ability of the OTS to obtain personal financial documents. On January 25, 1994, we stayed the enforcement of the subpoenas pending hearing and disposition.

## II.

■ Our role in a subpoena enforcement proceeding is limited to determining whether "the inquiry is within the authority of the agency, the demand is not too indefinite and the information sought is reasonably relevant." *United States v. Morton Salt Co.*, 338 U.S. 632, 652, 70 S.Ct. 357, 369, 94 L.Ed. 401 (1950); *see also Resolution Trust Corp. v. Walde*, 18 F.3d 943, 946 (D.C.Cir.1994) (same). As we recently emphasized in *Resolution Trust Corp. v. Grant Thornton*, "If an agency's subpoena satisfies these requirements, we must enforce it." 41 F.3d 1539, 1544 (D.C.Cir.1994). Appellants do not suggest that the request is too indefinite. Therefore, we focus our review on the remaining two requirements: whether the OTS operated within its statutory authority in issuing the subpoena; and whether the requested information was reasonably relevant. We discuss the statutory authority underpinning the OTS's three articulated investigatory purposes, and then consider the relevance of the subpoenaed information.

■ We are satisfied that the first purpose of the subpoenas—determining personal benefit—is within the OTS's authority, namely its power to issue an order of removal and prohibition. *See* 12 U.S.C. § 1818(e) (Supp. V 1993). Although appellants were removed from office when the OTS placed the bank into receivership, the OTS may still seek an order of prohibition because such an order may permanently bar appellants from participating in "the affairs of any insured depository institution." 12 U.S.C. § 1818(e)(1). An order of prohibition would be appropriate if, among other things, appellants "received financial gain or other benefit" as a result of a regulatory or statutory violation, unsafe or unsound practice, or a breach of fiduciary duties. 12 U.S.C. § 1818(e)(1)(B)(iii). Alerted to possible violations by the pattern of unusual monetary transfers between the accounts of the two businesses owned by appellants at a bank they controlled, the OTS thus exercised its valid statutory authority to pursue an investigation to determine whether appellants personally benefitted from certain activities.

■ Appellants urge us to require the OTS to make a preliminary determination of liability before issuing a subpoena for personal financial information. However, nothing in *Morton Salt* or in the agency's authorizing statutes imposes such a requirement. Indeed, the agency could not fulfill its investigative responsibilities, if, as appellants argue, it first had to make a finding of liability. If, as we have consistently stated, "an investigating agency is under no obligation to propound a narrowly focused theory of a *possible* future case" when seeking to enforce an administrative subpoena, it certainly cannot be that the agency must make a preliminary finding of liability before it can even initiate an investigation. *Federal Trade Comm'n v. Texaco, Inc.*, 555 F.2d 862, 874 (D.C.Cir.) (en banc), *cert. denied*, 431 U.S. 974, 97 S.Ct. 2940, 53 L.Ed.2d 1072 (1977).

While appellants insist that the personal financial nature of the subpoenaed information requires the court to alter its approach, previously we have only done so when an agency subpoenas personal information to determine cost-effectiveness. In *Walde*, we required the agency to demonstrate an "articulable suspicion" of liability before we would enforce a subpoena for personal financial information to further the agency's stated purpose of determining cost-effectiveness. *See* 18 F.3d at 949. We did not, however, require any similar finding when the RTC sought the same information to determine liability or prevent asset transfers. *See id.* at 947 ("To require the RTC to make such a preliminary determination of liability before subpoenaing documents that might reveal, for example, the fraudulent transfer of S & L assets would seriously hamper the agency's ability to locate and save a failed institution's assets."). Nothing requires a different rule for the OTS when it is seeking to determine whether a party has personally benefitted from alleged misconduct.

■ The request for information relating to ability to pay civil penalties is likewise grounded in statutory authority. The OTS may assess a civil money penalty against appellants if it determines that the overnight monetary transfers resulted in a violation of banking laws or regulations or a breach of fiduciary duty. *See* 12 U.S.C. § 1818(i)(2)(A)–(C) (Supp. V 1993). In assessing money penalties, Congress requires the agency to consider several mitigating factors, including "the size of financial resources" of the subpoenaed party. 12 U.S.C. § 1818(i)(2)(G)(i). It is for this reason, namely, to assess the ability of appellants to pay civil money penalties, that the agency is authorized to subpoena personal financial information.

■ Echoing their argument regarding personal gain, appellants contend that the OTS should be required to make a preliminary determination of liability before the court enforces a subpoena for personal financial information in order to protect their Fourth Amendment privacy interests. Appellants liken the wealth-based investigation into ability to pay a civil penalty to an investigation into cost-effectiveness, but argue that the "articulable suspicion" requirement of *Walde* is not adequate to protect them. They contend that, unlike in an investigation to assess cost-effectiveness, the agency needs to know nothing at all about their wealth in

order to determine whether they are liable. The OTS not only rejects appellants' argument for a preliminary determination of liability, but claims that it need not even satisfy the "articulable suspicion" requirement of *Walde.* Disavowing any cost-effectiveness purpose, the OTS emphasizes that it seeks to determine whether and to what extent the assessment of civil monetary penalties would be appropriate. We think neither party is correct.

We agree that the assessment of ability to pay civil penalties is not the same as evaluating cost-effectiveness. Each arises from different statutory authority. In *Walde,* the RTC based its authority to determine cost-effectiveness on its statutory mandate to "minimize[ ] the amount of any loss realized in the resolution of cases," 12 U.S.C. § 1441a(b)(3)(C)(iv) (Supp. V 1993), and to "conserve the assets and property of [the failed] institution." 12 U.S.C. § 1821(d)(2)(B)(iv) (Supp. V 1993). 18 F.3d at 948. Counsel for the RTC explained that the duty to "conduct investigations in a cost-effective manner" required "preliminary determinations about the potential sources of recovery so that we don't insert resources in investigations that are not warranted." *Id.* The OTS's authority to investigate an individual's financial situation before assessing a civil penalty springs from a different statutory source and has a different purpose. Consideration of financial resources is one of the several mitigating factors that Congress ordered the OTS to weigh in order to tailor the penalty to the violator. *See* 12 U.S.C. § 1818(i)(2)(G). Thus, the agency focuses on the appropriateness of the penalty to the violator, rather than the most efficient use of agency resources or, in other words, how much to assess rather than whom to pursue.

Although the investigatory purposes—cost-effectiveness and ability to pay a civil penalty—differ, an agency has no legitimate interest in seeking personal financial information for either purpose until it has some suspicion that the individual may be liable. Both purposes are predicated on an underlying source of liability which would call for the initiation of civil proceedings or give rise to the assessment of civil penalties. Accordingly, we hold

that the *Walde* standard applies here in addition to cost-effectiveness investigations. We require the OTS to have an "articulable suspicion" that "the target [of the subpoena] engaged in wrongdoing" before it may subpoena personal financial information for the purpose of determining an individual's ability to pay a civil penalty. *Walde,* 18 F.3d at 949; *see also Resolution Trust Corp. v. Grant Thornton,* 41 F.3d 1539, 1544–45 (D.C.Cir. 1994).

We reject, however, appellants' argument that we should go beyond *Walde* and require the OTS to make a preliminary determination of liability before it enforces the subpoenas in order to protect their privacy interests in personal financial documents. The constitutional concerns that arise here, which are identical to those in *Walde,* are satisfied by the application of the "articulable suspicion" standard. *See Walde,* 18 F.3d at 948–49 (declining to reach the Fourth Amendment challenge but finding an "articulable suspicion" requirement because of privacy concerns). This heightened standard sufficiently protects an individual from unwarranted invasions into personal financial documents when the agency's investigation is aimed at determining an individual's wealth. We find no further requirement in the Constitution.

 We have no doubt that the OTS did offer sufficient information to establish an articulable suspicion of wrongdoing in this case. Its investigation was triggered by appellants' involvement in the unusual monetary transfers between two companies that they owned within a bank that they controlled. *See* Declaration of Michael P. Moriarty, Oct. 27, 1993, J.A. at 37–42. We suggested, in *Walde,* that "records of the failed institution showing a suspicious asset transfer" would satisfy the requirement of an "articulable suspicion." 18 F.3d at 949. Appellants' assertion that their practice of transferring money was not illegal is irrelevant because "[r]easonable suspicion should not turn upon whether particular conduct is unlawful, but upon 'the degree of suspicion that attaches to particular types of noncriminal acts.'" *Id.* (quoting *Illinois v. Gates,* 462 U.S. 213, 243–44 n. 13, 103 S.Ct. 2317, n. 13,

76 L.Ed.2d 527 (1983)). We thus find that the suspicious asset transfers discovered by the OTS create an "articulable suspicion" of wrongdoing sufficient to permit the OTS to pursue its investigation into appellants' ability to pay a civil penalty.

■ Appellants' final challenge to the civil penalties prong of the subpoena is that the RTC seized sufficient assets belonging to them to cover the likely amount of any penalty, and that the OTS's investigation into their ability to pay is thus a pretext to obtain personal financial information that the agency does not need. We sought and received additional briefing regarding this allegation. In their supplemental brief, appellants estimate that the RTC is holding between $500,-000 and $1,500,000 in confiscated accounts of appellants and they assert that any potential fine would not exceed this amount. The OTS explains that the amount of the fine could be much greater: if it discovers that the violation was "knowing," the maximum civil monetary penalty would be $1,000,000 for each day in which the conduct occurred. *See* 12 U.S.C. § 1818(i)(2)(C), (D).

We are satisfied that the OTS will not and cannot know the appropriate amount of penalties for any statutory violations until it has completed its investigation. *See* 12 U.S.C. § 1818(i)(2) (requiring determination of underlying offense and accompanying mental state as well as specified mitigating factors). At this point, it is impossible to know if the funds held by the RTC would cover the entire penalty that the OTS may assess. Moreover, because the RTC may apply the monies it seized first to satisfy any claims that the RTC may bring against appellants, the funds ultimately may be unavailable to satisfy an OTS penalty.

■ With regard to the final purpose of the subpoenas—to uncover "other wrongdoing, as yet unknown"—we agree with appellants that the OTS offered no statutory authority to support this unlimited claim of investigatory power, nor have we discovered one. Furthermore, the broad language used to describe this purpose makes it impossible to apply the other prongs of the *Morton Salt* test. A reviewing court will be unable to determine whether the information demand-

ed is "reasonably relevant" and "not too indefinite" when the agency describes its purpose as the investigation of "other wrongdoing, as yet unknown." We thus reject this purpose as a basis for enforcing the subpoenas.

■ While the OTS correctly states that its investigation need not be limited to identified allegations nor a "narrowly focused theory of a *possible* future case," *Federal Trade Comm'n v. Texaco, Inc.*, 555 F.2d at 874, this does not afford it unfettered authority to cast about for potential wrongdoing in an individual's personal financial documents. Instead, the agency must articulate a valid statutory basis in support of its investigatory purposes. The OTS relies on the Supreme Court's decision in *Morton Salt* to support its broad investigative authority, but overlooks the Court's repeated admonitions that this power must be "within the authority of the agency." *Morton Salt*, 338 U.S. at 652, 70 S.Ct. at 369. *See also Oklahoma Press Publishing Co. v. Walling*, 327 U.S. 186, 209, 66 S.Ct. 494, 505, 90 L.Ed. 614 (1946) (emphasizing that administrative investigations must "be for a lawfully authorized purpose, within the power of Congress to command"). Thus, in the absence of specific authority in its enabling statute, the OTS cannot rely on its broad investigatory powers to pursue "other wrongdoing, as yet unknown."

The OTS's contention that appellants have only a limited expectation of privacy because they engaged in the highly regulated banking industry does not help it. It relies on *United States v. Miller*, in which the Supreme Court ruled that the government may subpoena a bank's business records even when they contain information regarding an individual's accounts without violating any constitutionally protected privacy interests. *See* 425 U.S. 435, 440, 96 S.Ct. 1619, 1622–23, 48 L.Ed.2d 71 (1976). However, unlike *Miller* where the government subpoenaed a bank's business records, the OTS subpoenas at issue here direct individuals to produce personal financial information. We do not believe that appellants waived all privacy interests by becoming members of the board of directors of a bank. Recognizing, as we did in *Walde*,

that the permissible scope of administrative subpoenas has grown, we think that the principles set forth by Justice Holmes remain true today, at least as they apply to an individual's private financial documents: "Anyone who respects the spirit as well as the letter of the Fourth Amendment would be loath to believe that Congress intended to authorize one of its subordinate agencies to ... direct fishing expeditions into private papers on the possibility that they may disclose evidence of a crime." *Federal Trade Comm'n v. American Tobacco Co.,* 264 U.S. 298, 305–06, 44 S.Ct. 336, 337–38, 68 L.Ed. 696 (1924) (citation omitted). The OTS desires to conduct such an expedition here into "other wrongdoing, as yet unknown." In the absence of an investigatory purpose based on identifiable statutory authority, we decline to enforce this purpose.

## III.

Having determined that the subpoenas were proper with respect to two of their stated purposes—determining personal benefit and assessing ability to pay a civil penalty—we turn to appellants' claim that the information the subpoena seeks is not relevant. We reiterated the standard for relevance in *Linde Thomson Langworthy Kohn & Van Dyke, P.C. v. Resolution Trust Corp.*: to be valid, an administrative subpoena must seek information that is "reasonably relevant" to the "general purposes of the agency's investigation." 5 F.3d 1508, 1516 (D.C.Cir.1993) (citations and internal punctuation omitted). As we held in *Federal Trade Comm'n v. Invention Submission Corp.,* we defer to the agency's appraisal of relevancy, which "must be accepted so long as it is not 'obviously wrong'" and "[i]f the district court finds that the information sought by the agency is relevant, [the court of appeals] will affirm unless that determination is 'clearly erroneous.'" 965 F.2d 1086, 1089 (D.C.Cir. 1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 1255, 122 L.Ed.2d 654 (1993).

■ Given this deferential approach to the agency's determination of relevance, we require the party challenging the investigation to bear the burden of demonstrating that the information sought is irrelevant.

*See Walde,* 18 F.3d at 947–48; *see also Invention Submission,* 965 F.2d at 1090. According to appellants, only the checks drawn on the law firm account during the period of the suspicious transfers, August through October 1990, are relevant to the current investigation. The OTS's investigation, however, is not so narrowly circumscribed. As we stated in *Invention Submission,* "The requested material ... need only be relevant to the *investigation*—the boundary of which may be defined quite generally." 965 F.2d at 1090. In this case, we have sustained the OTS's authority to pursue an investigation into potential personal benefit and ability to pay a civil penalty. It is against these two purposes that the relevance of the information sought must be evaluated.

■ The OTS contends that all of the information covered by the subpoenas, including both personal account information and asset transfers for the period from June 30, 1990, through October 1990, is relevant to determining whether appellants received any personal benefit from the unusual pattern of overdrafts. The OTS investigation of the bank revealed suspicious monetary transfers in August, September and October of 1990. All the information requested for these three months (we deal with July below) is thus clearly relevant, as it may disclose personal benefit accruing to appellants. We affirm the district court's enforcement of the subpoenas for these three months.

■ Appellants seek to cut off the investigation into their personal financial documents after February 1991 when the OTS placed the bank in receivership and effectively removed them from control of the bank. The OTS argues that its investigation must extend beyond February 1991 because it needs to determine if appellants transferred assets to hide them from an enforcement action and to assess their ability to pay a civil penalty. The district court found the information to be reasonably relevant to the agency's investigation. Finding its decision was not clearly erroneous, we affirm.

We are unable to resolve appellants' relevancy challenge with respect to the personal account information subpoenaed for July

1990, the month immediately prior to the beginning of the suspicious transfers, or with respect to the personal financial documents relating to asset transfers over $1000 from January 1, 1989, to July 31, 1990. Subpoenaed information after July 31, 1990, is, as we have found, clearly relevant to the two purposes of the subpoenas that we have sustained, but the record does not indicate whether information prior to that period is also relevant to those valid purposes, or whether the OTS needed it to investigate "other wrongdoing, as yet unknown." Accordingly, we remand to the district court for a determination of the relevance of the pre-July 31, 1990, information, bearing in mind that the party challenging relevance carries the burden of proof.

## IV.

For the foregoing reasons, we affirm two of the OTS's three avowed purposes for these subpoenas. It may subpoena information to discover whether appellants benefitted from the pattern of monetary transfers within the bank in order to determine whether to issue an order of prohibition. It also may seek information regarding appellants' financial resources in order to assist in the assessment of a civil penalty because it has an "articulable suspicion" of wrongdoing. However, the OTS is without statutory authority to subpoena information for the general purpose of uncovering "other wrongdoing, as yet unknown." Thus, we affirm in part and reverse in part, and remand to the district court with instructions to proceed in accordance with this opinion.

*So ordered.*