44 F.3d 1127
 63 USLW 2491
 In re McVANE.
M. Patricia McVANE, Jeffrey S. Hoffman, Michael G.
Economous, Robert H. Haines, III, Richard R.
Rangoon and Kenneth S. Schwartz,
Petitioners-Appellants,
v.
FEDERAL DEPOSIT INSURANCE CORPORATION, Respondent-Appellee.
 No. 506, Docket 94-6118.
 United States Court of Appeals,
Second Circuit.
 Argued Oct. 18, 1994.
Decided Jan. 12, 1995.
 
 Richard P. Weinstein, West Hartford, CT (Weinstein & Wisser, P.C., of counsel), for petitioners-appellants.
 Lawrence H. Richmond, F.D.I.C., Washington, DC (Ann S. DuRoss, Asst. Gen. Counsel, Colleen B. Bombardier, Sr. Counsel, Michelle Kosse, Counsel, of counsel), for respondent-appellee.
 Before: OAKES, ALTIMARI, and CABRANES, Circuit Judges.
 OAKES, Senior Circuit Judge:
 
 
 1
 This appeal concerns the enforcement of administrative subpoenas duces tecum issued by the Federal Deposit Insurance Corporation ("FDIC") in aid of its investigation of the former directors of a failed bank. At issue in particular is the subpoenas' request for extensive personal financial information from the former directors and their spouses and family members.
 
 
 2
 The six former directors (the "Directors") appeal from an order of the United States District Court for the District of Connecticut, Alfred V. Covello, Judge, approving, adopting and ratifying the ruling of F. Owen Eagan, Magistrate Judge, denying the Directors' motions to quash the subpoenas and granting the FDIC's cross-motion for summary enforcement. We conclude that administrative subpoenas which seek personal records from family members of the targets of an investigation into corporate wrongdoing must face more exacting scrutiny than subpoenas seeking records from the targets themselves. We conclude further that the challenged subpoenas, to the extent they seek information from family members, fail to withstand that heightened scrutiny. Therefore, we vacate the district court's order insofar as it enforces those portions of the subpoenas which seek personal information from the Directors' families.
 
 BACKGROUND
 
 3
 This appeal arises out of the failure of the Landmark Bank of Hartford, Connecticut ("Landmark"). Landmark was declared insolvent in March 1991, and the FDIC was appointed receiver. In July 1993, acting pursuant to statutory authority, the FDIC issued an Order of Investigation of Landmark's former officers and directors. See Order of Investigation of July 12, 1993 (citing 12 U.S.C. Secs. 1818-21 & 12 C.F.R. Sec. 308 subpart K) (the "Order of Investigation" or the "Order").
 
 
 4
 According to the Order, the investigation had four purposes:
 
 
 5
 to determine whether (1) such former officers, directors, and others ... may be liable ... as a result of any actions or failures to act which may have affected The Landmark Bank; (2) pursuit of such litigation would be cost effective, considering the extent of the potential defendants' ability to pay a judgment in any such litigation; (3) the FDIC should seek to avoid a transfer of any interests or an incurrence of any obligation; and (4) the FDIC should seek an attachment of assets.
 
 
 6
 Order of Investigation at 1.
 
 
 7
 The Order, among other things, authorized FDIC representatives to issue subpoenas duces tecum to assist their investigation. Pursuant to this authorization, the FDIC issued subpoenas duces tecum to the six Directors, seeking extensive personal financial records of them and their immediate families for the five years preceding August 1992 (the "subpoenas"). (The FDIC has consented to withdraw its subpoena of the records of one of the Directors, Kenneth Schwartz, so we consider only the appeals of the five remaining Directors.)[1] The subpoenas to the five remaining Directors are identical. They require the Directors to produce all documents "prepared, generated, or received" on or after August 1, 1987, as follows:
 
 
 8
 1. Your current financial statement and all financial statements listing your assets and liabilities, (alone or with others).
 
 
 9
 2. All financial statements of your spouse.
 
 
 10
 3. All credit applications submitted by you or your spouse, alone or with others, to any depository institution or any other person or entity.
 
 
 11
 4. All records [prepared, generated, or received on or after August 1, 1992] referring or relating to any account in any depository institution maintained by you or any member of your immediate family, or over which you or they have exercised control, or as to which you or they are or were a signatory, or in which you or they had or have a financial interest, including but not limited to: (a) checking and savings account statements; (b) records of loans made or received; (c) records of certificates of deposit and other time deposit items purchased or redeemed; (d) records of safe deposit boxes; (e) cancelled checks.
 
 
 12
 5. All promissory notes or other forms of indebtness [sic] under which you are or were liable (with or without recourse) individually or with any other person or entity.
 
 
 13
 6. All records prepared, generated, or received on or after August 1, 1992 referring or relating to the source and amount of any income received by you on your behalf, including but not limited to all wages, salary, commissions, bonuses, interest and dividend payments, and any other form of income received by you.
 
 
 14
 7. Records of all accounts, notes or other debt obligations owed to you individually or with others.
 
 
 15
 8. All records referring or relating to real property owned by you individually or with others, including but not limited to all deeds, tax statements, mortgages, liens, encumbrances and appraisals.
 
 
 16
 9. All Federal, state and local tax returns filed by you either individually or jointly with another, along with all forms and schedules filed with such returns.
 
 
 17
 10. Titles and registrations for all motor vehicles, boats and airplanes owned by you or in which you have any interest, either individually or jointly with others.
 
 
 18
 11. All records prepared, generated, or received on or after August 1, 1992 referring or relating to stocks, bonds, securities or other investments currently owned by you individually or with others, including but not limited to any statements showing their value.
 
 
 19
 12. All documents referring or relating to any pension or profit-sharing plan, including any individual retirement account, simplified employee pension plan, 401(k), ERISA, KEOGH, or any other form of deferred tax, retirement or profit sharing plan in which you or your spouse have or had an interest.
 
 
 20
 13. All documents relating to any interest held by you in any stamp, coin, antique, jewelry, art work; furnishings, or other personal collections having a value in excess of $5,000.
 
 
 21
 14. All records referring or relating to any ownership interest by you in any entity, partnership, corporation, limited partnership, general partnership, joint venture or other business association or sole proprietorship, including but not limited to records of assets and liabilities, income statements and balance sheets.
 
 
 22
 15. All documents which refer or relate to any interest held by you, either as beneficiary, grantor, or trustee in any trust of any kind.
 
 
 23
 16. Copies of all insurance on your life or any annuity policies for your life or any term of years, whether or not such policies are owned by you, and the cash surrender value and loan amount (if any) on each policy.
 
 
 24
 17. All documents that reflect, refer or relate to any financial, real or personal property transactions in which you, or anyone acting on your behalf, or under your control or influence, have been involved, (except as the attorney, employee or agent of another party on transactions in which you had no personal interest), having a value of $5,000 or more, per person or organization per year, including, but not limited to, the following:
 
 
 25
 a. all real and personal property purchases, sales or transfers, with or without consideration;
 
 
 26
 b. all trust participations;
 
 
 27
 c. mortgages, trusts or other liens on security interests obtained or supplied to any third party;
 
 
 28
 d. lawsuits; and
 
 
 29
 e. repossessions and returns.
 
 
 30
 18. All records of inheritances, bequests, and other such gifts received by you or any member of your immediate family.
 
 
 31
 19. All documents which reflect any interests or title held by you in accounts receivable, business fixtures, equipment, inventory or machinery.
 
 
 32
 20. All documents reflecting any interests held by you in any property settlements to which you are or may be entitled.21. All documents reflecting any interests held by you in any tax refund, whether liquidated, contingent, or unliquidated.
 
 
 33
 22. All documents referring or relating to any transfer of assets exceeding $5,000 to any entity, account, place or person located outside the United States of America.
 
 
 34
 23. All documents listing any beneficial ownership of, or control over, any asset with a value exceeding $5,000 which was located outside the United States of America.
 
 
 35
 24. All records referring or relating to any interest you hold in any real personal or other type of property exceeding $5,000 in value not described above.
 
 
 36
 25. All documents referring or relating to any debt or obligation owed by you or claim asserted against you, in an amount greater than $5,000.
 
 
 37
 Upon receipt of the subpoenas, the Directors each filed separate motions to quash, and their motions were consolidated into this single action. The FDIC countered with a cross-motion for summary enforcement of the subpoenas. In support of its enforcement motion, the FDIC submitted a declaration by an FDIC investigator, Allen Glass (the "Glass Declaration"), which set out the factual basis for the FDIC's suspicions of wrongdoing by the Directors. The FDIC's allegations of wrongdoing are set out in their entirety in four paragraphs, as follows:
 
 
 38
 8. I have reviewed certain losses sustained by Landmark resulting from insider loans made to certain directors of Landmark, including Messrs. Haines and Schwartz and certain of the directors' business associates. The transactions resulted in losses in excess of nine million dollars to Landmark. These loans were originated and approved by the Movants while serving as directors of the now defunct bank. The insider loans leading to the losses in excess of nine million dollars were approved after the Bank had received regulatory warnings concerning the safety and soundness of its operations. The Movants were also responsible for approving additional transactions leading to approximately ten million more in losses at the Bank, which are being examined by the FDIC as part of this investigation.
 
 
 39
 9. The extent and nature of the loss sustained by Landmark on the insider loan transactions suggest that the Movants were grossly negligent and that the Movants violated their fiduciary duty of loyalty to Landmark in making said insider loans. To the extent the Movants were borrowers for particular loans, the Movants enriched themselves in the process.
 
 
 40
 10. Pursuant to the subpoenas, documents are sought from the Movants to verify the accuracy of Landmarks's [sic] records. Additionally, the documents are sought to determine whether the Movants have transferred assets under circumstances in which the FDIC should attempt to avoid the transfers; whether the FDIC should seek to attach the Movants' assets; and, whether any litigation initiated by the FDIC would be cost-effective. The subpoenas at issue seek the production of materials directly relevant to the purposes of the investigation of Landmark, which is authorized by the Order of Investigation. The information sought is largely current financial information pertaining to the Movants and said information is not already in the possession of the FDIC.
 
 
 41
 11. The FDIC has learned that at least one other former director of Landmark transferred millions of dollars worth of real estate to his spouse and an irrevocable family trust after the failure of Landmark. The FDIC must determine whether the Movants have transferred assets as well.
 
 
 42
 Glass Decl. pp 8-11.
 
 
 43
 In a ruling dated February 10, 1994, the magistrate judge granted the FDIC's enforcement motion and denied the Directors' motion to quash. The district court adopted the magistrate judge's ruling on April 19, 1994, and the Directors filed this appeal.
 
 DISCUSSION
 
 44
 The Directors have not objected to turning over records in their possession that pertain to their roles as former directors of Landmark. It is the requests for personal information not related to their capacities as directors, and for the personal financial records of their families, to which they object. They appeal these requests on essentially three grounds: (1) that the scope of the information sought in the subpoenas, particularly the information sought from the Directors' families, is excessively broad and not reasonably related to the proper purposes of the investigation, and violates the constitutional right to privacy of the Directors and their families; (2) that one of the investigations' stated purposes--determining the extent of the Directors' assets in order to ascertain whether they would be able to satisfy a judgment against them--is improper; and (3) that the FDIC's investigation has essentially been completed, thus rendering the subpoenas moot. We discuss these contentions in turn.
 
 I. The Scope of the Subpoenas
 
 45
 The Directors contend that the FDIC subpoenas are so broad in scope as to amount to a "fishing expedition" into the finances of the Directors and their families, "in the hope that it will find something, somewhere, in the vast amount of requested financial information that will create a case for the FDIC." Brief for Petitioner-Appellants ("Directors' Brief") at 6. Much of the requested information, they argue, bears no relation to the investigation of Landmark's collapse. In particular, extensive personal financial records are sought from members of the Directors' families who had no involvement in the bank's management. These records, they contend, are sought on the basis of only unsubstantiated and vague assertions of wrongdoing and bear at best a speculative relation to the subject of the investigation. The FDIC, they contend, is thus "leapfrogging over the possible wrongdoer to an innocent party and then working its way back to try and find a possible wrongdoer." Id. at 10. Such an approach, they contend, violates the constitutional right to privacy of the Directors and their families. We concur with the Directors' assertions in part.
 
 
 46
 The statute which grants the FDIC power to issue subpoenas places few restrictions on that power. The statute provides:
 
 
 47
 The Corporation may, as conservator, receiver, or exclusive manager and for purposes of carrying out any power, authority, or duty with respect to an insured depository institution (including determining any claim against the institution and determining and realizing upon any asset of any person in the course of collecting money due the institution), exercise any power established under section 1818(n) of this title....
 
 
 48
 12 U.S.C.A. Sec. 1821(d)(2)(I)(i) (West Supp.1994). Section 1818(n) provides that the FDIC, among other powers, "shall have the power ... to issue, revoke, quash, or modify subpenas [sic] and subpenas duces tecum ..." 12 U.S.C. Sec. 1818(n) (1988 & Supp. I 1989). Thus, the only statutory restriction on the FDIC's power to issue subpoenas is that they be issued "for purposes of carrying out any power, authority, or duty with respect to an insured depository institution." Any limitation beyond this on the agency's subpoena power must be found, if at all, in the Constitution, particularly in the Fourth and Fifth Amendments.
 
 
 49
 Courts have imposed few constitutional limitations on agencies' power to issue administrative subpoenas. While the Supreme Court early in this century strongly condemned "fishing expeditions into private papers on the possibility that they may disclose evidence of crime," FTC v. American Tobacco Co., 264 U.S. 298, 306, 44 S.Ct. 336, 337, 68 L.Ed. 696 (1924), that position was decisively abandoned in Oklahoma Press Pub. Co. v. Walling, 327 U.S. 186, 66 S.Ct. 494, 90 L.Ed. 614 (1946), and United States v. Morton Salt Co., 338 U.S. 632, 70 S.Ct. 357, 94 L.Ed. 401 (1950). See generally 1 Kenneth C. Davis & Richard J. Pierce, Jr., Administrative Law Treatise Secs. 4.1, 4.2, 4.5 (3d ed. 1994).
 
 
 50
 In Oklahoma Press, the Supreme Court made clear the distinction between "cases of actual search and seizure," as to which the Fourth Amendment requires probable cause, and those involving subpoena of documents, which it characterized as, at best, "constructive" searches. 327 U.S. at 202-08, 66 S.Ct. at 502-05; see also United States v. Dionisio, 410 U.S. 1, 8-10, 93 S.Ct. 764, 768-70, 35 L.Ed.2d 67 (1973) (grand jury subpoena is not a "seizure"); United States v. Doe (Schwartz), 457 F.2d 895, 898 (2d Cir.1972) (Friendly, J.) (same), cert. denied, 410 U.S. 941, 93 S.Ct. 1376, 35 L.Ed.2d 608 (1973). The Court concluded that, with regard to subpoenas ordering production of corporate records,
 
 
 51
 the Fifth Amendment affords no protection by virtue of the self-incrimination provision, whether for the corporation or for its officers; and the Fourth, if applicable, at the most guards against abuse only by way of too much indefiniteness or breadth in the things required to be "particularly described," if also the inquiry is one the demanding agency is authorized by law to make and the materials specified are relevant. The gist of the protection is in the requirement, expressed in terms, that the disclosure sought shall not be unreasonable.
 
 
 52
 327 U.S. at 208, 66 S.Ct. at 505; see also In re Grand Jury Subpoena Duces Tecum, 1 F.3d 87, 93 (2d Cir.1993) (Fifth Amendment does not protect the contents of voluntarily prepared documents, regardless of their business or personal nature), cert. denied, --- U.S. ----, 114 S.Ct. 920, 127 L.Ed.2d 214 (1994).
 
 
 53
 In Morton Salt, the Court extended and refined the Oklahoma Press analysis. An administrative agency, the Court reasoned, "has a power of inquisition" akin to that of a grand jury, which it may exercise "merely on suspicion that the law is being violated, or even just because it wants assurance that it is not." 338 U.S. at 642-43, 70 S.Ct. at 364. It is possible, the Court concluded, that an investigation into corporate matters "may be of such a sweeping nature and so unrelated to the matter properly under inquiry as to exceed the investigatory power." Id. at 652, 70 S.Ct. at 364. However, it concluded, "it is sufficient if the inquiry is within the authority of the agency, the demand is not too indefinite and the information sought is reasonably relevant." Id. (emphasis added).
 
 
 54
 The Morton Salt standard, with minor linguistic variations, has become the accepted test for judicial enforcement of administrative subpoenas. See, e.g., United States v. Stuart, 489 U.S. 353, 359, 109 S.Ct. 1183, 1188, 103 L.Ed.2d 388 (1989) (IRS Commissioner "must show that the investigation will be conducted pursuant to a legitimate purpose, that the inquiry may be relevant to the purpose, that the information sought is not already within the Commissioner's possession, and that the administrative steps required by the Code have been followed") (quoting United States v. Powell, 379 U.S. 48, 57-58, 85 S.Ct. 248, 255, 13 L.Ed.2d 112 (1964)); United States v. Arthur Young & Co., 465 U.S. 805, 813 n. 10, 104 S.Ct. 1495, 1500-01 n. 10, 79 L.Ed.2d 826 (1984); Federal Election Comm'n v. Larouche Campaign, 817 F.2d 233, 234 (2d Cir.1987) (per curiam) (administrative subpoena must be enforced "so long as it is for a proper purpose, the information sought is relevant to that purpose, and the statutory procedures are observed"); FTC v. Rockefeller, 591 F.2d 182, 189 (2d Cir.1979); see also Resolution Trust Corp. v. Walde, 18 F.3d 943, 946-47 (D.C.Cir.1994); FTC v. Invention Submission Corp., 965 F.2d 1086, 1089 (D.C.Cir.1992), cert. denied, --- U.S. ----, 113 S.Ct. 1255, 122 L.Ed.2d 654 (1993); United States v. Church of Scientology, Inc., 933 F.2d 1074, 1076 (1st Cir.1991); Sandsend Fin. Consultants, Ltd. v. Federal Home Loan Bank Bd., 878 F.2d 875, 878-79 (5th Cir.1989).
 
 
 55
 The courts' role in a proceeding to enforce an administrative subpoena is "extremely limited." NLRB v. C.C.C. Assoc., Inc., 306 F.2d 534, 538 (2d Cir.1962); Rockefeller, 591 F.2d at 189. We defer to the agency's appraisal of relevancy, which "must be accepted so long as it is not obviously wrong." Walde, 18 F.3d at 946 (quoting Invention Submission, 965 F.2d at 1089). Furthermore, if the district court concludes that the information sought by the agency is relevant, we will affirm unless that determination is clearly erroneous. Id. at 946-47.
 
 
 56
 The burden of demonstrating that an administrative subpoena is unreasonable falls on the individual to whom it is directed. Rockefeller, 591 F.2d at 190. The relevance of the sought-after information is measured against the general purposes of the agency's investigation, "which necessarily presupposes an inquiry into the permissible range of investigation under the statute." Linde Thomson Langworthy Kohn & Van Dyke, P.C. v. Resolution Trust Corp., 5 F.3d 1508, 1516 (D.C.Cir.1993). An affidavit from a government official is sufficient to establish a prima facie showing that these requirements have been met. See Stuart, 489 U.S. at 360, 109 S.Ct. at 1188; United States v. Comley, 890 F.2d 539, 541-42 (1st Cir.1989).
 
 
 57
 We have interpreted relevance broadly. See United States v. Arthur Young & Co., 677 F.2d 211, 216 (2d Cir.1982) (allowing IRS to investigate by means of a "broad, generic document request" because "[b]efore the IRS knows where the issues lie, it has no choice but to utilize a general summons"), aff'd in part and rev'd in part on other grounds, 465 U.S. 805, 104 S.Ct. 1495, 79 L.Ed.2d 826 (1984), cert. denied, 466 U.S. 936, 104 S.Ct. 1906, 80 L.Ed.2d 456 (1984); United States v. Noall, 587 F.2d 123, 125 (2d Cir.1978) (standard for relevance of sought-after tax records is whether the documents "might have thrown light upon" the object of the investigation), cert. denied, 441 U.S. 923, 99 S.Ct. 2031, 60 L.Ed.2d 396 (1979); accord Linde Thomson, 5 F.3d at 1517 (wide range of investigation is appropriate where "multifaceted activities are involved, and the precise character of possible violations cannot be known in advance") (quoting FTC v. Texaco, Inc., 555 F.2d 862, 877 (D.C.Cir.) (en banc), cert. denied, 431 U.S. 974, 97 S.Ct. 2939, 53 L.Ed.2d 1072 (1977)).
 
 
 58
 The FDIC contends that the information it seeks is relevant to all four of the investigation's purposes--(1) determining the liability of the Directors (by revealing suspicious accretions of wealth or other evidence of improper transactions between the Directors and Landmark); (2) determining whether the pursuit of claims against the Directors would be cost-effective (by revealing the extent of the Directors' assets); (3) determining whether the Directors transferred assets to family members; and (4) determining whether to seek an attachment of assets. (The Directors attack the legitimacy of only the second of these purposes, see Section II infra.) Accordingly, the FDIC contends, the district court was correct in deferring to the agency's appraisal of the relevance of the requested documents.
 
 
 59
 We concur as far as the records of the Directors themselves are concerned. Under the Morton Salt standard set out above, the district court's determination that these records were relevant was not clearly erroneous. We disagree, however, about the reasonableness of the FDIC's subpoena of the personal financial records of the Directors' families.[2]
 
 
 60
 In reaching this conclusion, we keep in mind the Supreme Court's admonition in Oklahoma Press that "[t]he gist of the protection [provided by the Fourth Amendment against administrative subpoenas] is in the requirement, expressed in terms, that the disclosure sought shall not be unreasonable." 327 U.S. at 208, 66 S.Ct. at 505.
 
 
 61
 We note also that, in asserting a relatively unchecked administrative subpoena power into corporate affairs, the Court in Morton Salt relied substantially on the limited Fourth Amendment rights of corporations, which "can claim no equality with individuals in the enjoyment of a right to privacy." 338 U.S. at 652, 70 S.Ct. at 368; accord G.M. Leasing Corp. v. United States, 429 U.S. 338, 353, 97 S.Ct. 619, 629, 50 L.Ed.2d 530 (1977) (Supreme Court has recognized that "a business, by its special nature and voluntary existence, may open itself to intrusions that would not be permissible in a purely private context").
 
 
 62
 In contrast to the limited rights of corporations, the courts have recognized certain "rights to privacy" of individuals, variously said to be derived from the First, Fourth, Fifth, and Fourteenth Amendments. Among these protected rights is "the individual interest in avoiding disclosure of personal matters." Nixon v. Administrator of General Services, 433 U.S. 425, 457, 97 S.Ct. 2777, 2797, 53 L.Ed.2d 867 (1977); Whalen v. Roe, 429 U.S. 589, 599, 97 S.Ct. 869, 876, 51 L.Ed.2d 64 (1977); see also Igneri v. Moore, 898 F.2d 870, 873 (2d Cir.1990); Eisenbud v. Suffolk County, 841 F.2d 42, 45 (2d Cir.1988); Barry v. City of New York, 712 F.2d 1554, 1559 (2d Cir.), cert. denied, 464 U.S. 1017, 104 S.Ct. 548, 78 L.Ed.2d 723 (1983); United States v. Westinghouse Elec. Corp., 638 F.2d 570, 577 (3d Cir.1980); Plante v. Gonzalez, 575 F.2d 1119, 1132 (5th Cir.1978), cert. denied, 439 U.S. 1129, 99 S.Ct. 1047, 59 L.Ed.2d 90 (1979).
 
 
 63
 Although these cases have recognized individuals' right to privacy in personal matters, and although the Morton Salt case recognized that individuals enjoy greater rights of privacy than do corporations, courts have nevertheless applied the lenient Morton Salt test to administrative subpoenas seeking personal records. See, e.g., United States v. Stuart, 489 U.S. 353, 109 S.Ct. 1183, 103 L.Ed.2d 388 (1989) (applying relevance test to IRS investigation of individuals' tax returns); Walde, 18 F.3d at 945-47 (applying Morton Salt test to agency subpoena for personal financial information of former directors of failed savings and loan institutions ("S & Ls")).
 
 
 64
 While applying the relevance test, however, we have not lost sight of the fact that agency subpoenas directed at individuals do implicate privacy rights. See United States v. Harrington, 388 F.2d 520, 524 (2d Cir.1968) (applying a relevance standard for IRS subpoena, yet noting that the "personal interest cannot be ... blithely brushed aside"); Walde, 18 F.3d at 948-49 (distinguishing between subpoenas directed at corporations and at individuals in evaluating whether subpoenas were within RTC's authority).
 
 
 65
 Concern for these privacy rights has at times caused this court to be more reluctant to enforce subpoenas when agencies have sought records of third parties who were not targets of the agency's investigation. Judge Friendly, for example, when describing the low showing required of the IRS to secure enforcement of a subpoena, noted: "The threshold is particularly low when, as here, the papers at issue are the taxpayer's own and there is no question of the invasion of the privacy of third persons against their will." Noall, 587 F.2d at 126; see also Harrington, 388 F.2d at 523 ("judicial protection against the sweeping or irrelevant order is particularly appropriate in matters where the demand for records is directed not to the [target] but to a third-party who may have had some dealing with the person under investigation").
 
 
 66
 This concern for third parties' rights by no means has led courts to quash any and every subpoena directed at a third party. In cases in which the third party was a corporate entity, for example, the Morton Salt test has applied. See, e.g., Sandsend, 878 F.2d at 878-81 (upholding subpoena of bank's customer records where neither bank nor corporate customer was target). We have also evinced less concern with third party privacy rights when the third party "involve[d] itself in matters that were likely to be the object of governmental inquiry." Arthur Young, 677 F.2d at 216 (relevance test appropriate where subpoena directed at independent auditor of target of investigation).
 
 
 67
 The instant case presents a subpoena that seeks personal records from individuals who are married to or are immediate family members of the targets of an FDIC investigation. Individual privacy rights are therefore implicated. The question is whether by virtue of marriage or other familial relationship the family members have somehow relinquished protection of these rights. We think that they have not.
 
 
 68
 Individuals, such as these family members, who do not participate in corporate matters that might reasonably become the subject of government inquiry have a greater "reasonable expectation of privacy," Katz v. United States, 389 U.S. 347, 360, 88 S.Ct. 507, 516, 19 L.Ed.2d 576 (1967) (Harlan, J., concurring), in their personal financial affairs than do those individuals who do participate in such matters. To be sure, courts have tended to afford greater deference when the third party is "directly associated" with an investigation target or is not a "stranger" to the target. See Sandsend, 878 F.2d at 878; Arthur Young, 677 F.2d at 216. The family members here have been named in the subpoena precisely because of their close relationships to the targets. But while close, the relationships at issue are wholly personal. A person does not involve him or herself in matters foreseeably the object of agency inquiry simply by being a member of another's family. Conjugal or familial association with a corporate participant does not, by itself, strip an individual of his or her expectation of privacy.
 
 
 69
 Accordingly, we conclude that administrative subpoenas issued pursuant to an agency investigation into corporate wrongdoing, which seek personal records of persons who are not themselves targets of the investigation and whose connection to the investigation consists only of their family ties to corporate participants, must face more exacting scrutiny than similar subpoenas seeking records solely from corporate participants.
 
 
 70
 With regard to subpoenas seeking such material, we conclude, "an administrative agency is not automatically entitled to obtain all material that may in some way be relevant to a proper investigation. Rather ... the agency must make some showing of need for the material sought beyond its mere relevance to a proper investigation." Federal Election Comm'n v. Larouche Campaign, 817 F.2d 233, 234 (2d Cir.1987) (per curiam). We note that we have applied a similar, "intermediate" level of scrutiny to laws requiring individuals to disclose personal financial information. See Bertoldi v. Wachtler, 952 F.2d 656, 659 (2d Cir.1991) (government must show that the compelled disclosure is designed to further a substantial governmental interest and is not unreasonable in scope); Igneri, 898 F.2d at 873 (same); Eisenbud, 841 F.2d 42 (same); Barry, 712 F.2d at 1559 (same).[3]
 
 
 71
 Applying this enhanced scrutiny to the FDIC's subpoenas as they concern the Directors' spouses and family members, we do not think the agency has, at this point, made the required showing of need for the personal financial materials it seeks.[4]
 
 
 72
 The FDIC contends that these materials are needed in order for it to determine whether the Directors transferred assets to spouses or family members. This purpose falls within the FDIC's statutory mandate. See 12 U.S.C.A. Sec. 1821(d)(17)(A) (West Supp.1994) (authorizing FDIC to avoid asset transfers as far as five years before the date the FDIC was appointed receiver which were motivated by an intent to hinder, delay, or defraud the insured institution or the agency). In order to determine whether such a transfer was made, the agency contends, it needs to look at both sides of any such transaction, and hence it needs access to the financial records of the Directors' families.
 
 
 73
 The FDIC has not, however, substantiated its need for these materials. Its motion for enforcement is supported only by the Glass Declaration. The only references in the Declaration to asset transfers are the following two statements: (1) "the documents are sought to determine whether the Movants have transferred assets under circumstances in which the FDIC should attempt to avoid the transfers"; and (2) "[t]he FDIC has learned that at least one other former director of Landmark transferred millions of dollars worth of real estate to his spouse and an irrevocable family trust after the failure of Landmark. The FDIC must determine whether the Movants have transferred assets as well." Glass Decl. pp 10, 11.
 
 
 74
 We find these statements insufficient to demonstrate the agency's need for the extensive familial records it seeks. First, the FDIC has articulated no grounds for suspecting that any of these Directors (as opposed to the unnamed "other former director") has transferred assets to family members. Second, the agency has made no showing as to why its stated goal could not be accomplished through more narrowly drawn subpoenas--limited either to the Directors' financial records, or, if some familial documents were needed, to records of transfers of assets from the Directors. Additionally, the references in paragraphs 4 and 18 of the subpoenas to "any member of your immediate family" are unnecessarily sweeping and vague; if any documents are required from family members, such persons must be specified with greater precision.
 
 
 75
 Accordingly, we vacate that portion of the district court's order which enforces those provisions of paragraphs 2, 3, 4, 12, and 18 of the subpoenas which seek records from family members. This is without prejudice to the FDIC's redrafting of these provisions and/or submission of further evidence in support of enforcement.
 
 
 76
 II. Seeking Deep Pockets: An Improper Purpose?
 
 
 77
 The Directors also assail the legitimacy of one of the Landmark investigation's four stated purposes--determining whether the Directors have sufficient net worth to warrant an action against them. The illegitimacy of this purpose, they contend, taints the entire investigation and provides cause for quashing of the subpoenas.
 
 
 78
 Before addressing the legitimacy of this investigative purpose, we note that the Directors' argument sweeps too broadly. Even if the Directors can show that one purpose underlying the subpoenas is improper, enforcement of the subpoenas is called for nonetheless so long as other, proper purposes exist. FTC v. Carter, 636 F.2d 781, 789 (D.C.Cir.1980); and see Donaldson v. United States, 400 U.S. 517, 532-33, 91 S.Ct. 534, 543-44, 27 L.Ed.2d 580 (1971) (noting that taxpayer could claim that the IRS sought material for an improper purpose only if that purpose were the sole object of the investigation). Thus, this argument of the Directors threatens only those provisions in the subpoenas which depend solely on the FDIC's cost-effectiveness rationale. Although the Directors have identified no such sections, we think paragraphs 18 to 21, 24, and 25 fit this description.[5] Accordingly, if we were to determine that the FDIC's cost-effectiveness rationale were improper, we would be required to quash these provisions of the subpoenas.
 
 
 79
 We do not find the FDIC's purpose improper, however, in the context of this investigation. The Directors rely on Resolution Trust Corp. v. Walde, 18 F.3d 943 (D.C.Cir.1994), in which the D.C. Circuit considered a similar investigation directed at former directors and officers of failed S & Ls by the Resolution Trust Corporation (the "RTC"). The court held that the RTC does not have the authority to subpoena personal financial information for the purpose of determining a former director's net worth unless the agency has set forth "at least an articulable suspicion that a former officer or director is liable to the failed institution." Id. at 949 (emphasis added). We concur in the Walde court's reasoning (which applies equally to FDIC investigations),[6] but we conclude that the FDIC has complied with the standard set out in Walde.
 
 
 80
 The FDIC is authorized to "conserve the assets and property of [the failed] institution," 12 U.S.C. Sec. 1821(d)(2)(B)(iv) (Supp. III 1991), and, under 12 U.S.C. Sec. 1821(d)(2)(I)(i), it has broad authority to issue subpoenas in furtherance of "any power, authority, or duty with respect to an insured depository institution." See also Walde, 18 F.3d at 948 (noting that the RTC has the same powers). To the FDIC, these sections, in conjunction with the other provisions of the FDIC statute, provide the agency with a mandate to carry out its mission in a way that minimizes the costs to the U.S. taxpayer, and assessing the cost-effectiveness of potential litigation is an integral part of this endeavor. See id.
 
 
 81
 Congress, however, did not thereby "intend[ ] to authorize the [FDIC] to browse among the private papers of citizens whose only sin had been to serve as officers or directors of defunct S & Ls." Id. at 949. As we reasoned above with regard to the subpoenas of spousal and familial records, the Directors enjoy certain privacy rights in their personal papers that they do not enjoy when acting in their corporate capacities. While an agency may normally exercise its "power of inquisition" into corporate matters "merely on suspicion that the law is being violated, or even just because it wants assurance that it is not," Morton Salt, 338 U.S. at 642-43, 70 S.Ct. at 363-64, it may not browse freely through personal papers solely to ascertain the depth of the pockets of a potential target.
 
 
 82
 Accordingly, before it may subpoena the personal financial information of a potential target for the purpose of determining that individual's net worth, the FDIC must articulate specific grounds for its suspicion of liability. In evaluating the agency's proffered grounds, we will "give 'due weight ... to the specific reasonable inferences' that the [FDIC] might draw from the information available to it in light of its experience investigating other failed institutions." Walde, 18 F.3d at 949 (quoting Terry v. Ohio, 392 U.S. 1, 27, 88 S.Ct. 1868, 1883, 20 L.Ed.2d 889 (1968)).
 
 
 83
 The FDIC has clearly met this standard in the grounds for suspicion it articulated in the Glass Declaration. Glass declared that, in examining Landmark's records, he found that the institution had lost more than $9 million on insider loans to certain Landmark directors and their business associates, that the loans had been originated and approved by the directors even after they had been warned by regulators about the soundness of Landmark's operations, and that another director had transferred millions of dollars worth of real estate to family members after Landmark failed. Glass Decl. pp 8-11. These allegations are more than sufficient to support the FDIC's request for information concerning the Directors' net worth.[7]
 
 III. Mootness of the Subpoenas
 
 84
 The Directors contend, finally, that the FDIC's subpoenas have become moot in light of the fact that the FDIC has "essentially completed its investigation of the appellants." Directors' Br. at 21. For this contention, the Directors rely on the fact that the FDIC sent letters dated February 17, 1994, to at least four of the Directors, stating that "FDIC now is completing its investigation" and requesting a meeting with directors and officers of Landmark, including the Directors, to discuss, among other things, the possibility of settlement. See letter of William R. Einhorn to Richard R. Rangoon, dated Feb. 17, 1994. If the investigation is essentially over, the Directors contend, the extensive personal financial information sought by the subpoenas is no longer needed.
 
 
 85
 We must disagree. First, we cannot accept the Directors' characterization of the investigation as "essentially completed." This is a characterization which the FDIC contests, and one, furthermore, which is not supported by the letters on which the Directors rely, which characterize the investigation as "ongoing." See id.
 
 
 86
 Second, the Directors' argument is legally meritless. As the D.C. Circuit has recently held, the initiation of civil proceedings does not moot an administrative subpoena. Walde, 18 F.3d at 950; Linde Thomson, 5 F.3d at 1518. If the actual commencement of a lawsuit against directors does not terminate the FDIC's investigative authority, certainly an invitation to a settlement conference does not either.
 
 CONCLUSION
 
 87
 For the reasons set forth above, we hold that the subpoenas are not moot and were not issued for an improper purpose, but that the FDIC failed to make the required showing of need for the personal financial records of the Directors' families. Accordingly, we vacate that portion of the district court's order which enforces those provisions of paragraphs 2, 3, 4, 12, and 18 of the subpoenas which seek records from family members. We affirm the rest of the order, and remand to the district court for enforcement consistent with this opinion, without prejudice to the FDIC's redrafting of these provisions and/or submission of further evidence in support of enforcement.
 
 
 
 [1]
 The Schwartz subpoena differed from the other five subpoenas in that it was addressed not to Schwartz individually but to his accountant, Alan Friedman, and requested a somewhat different list of records. In response to the Directors' objections to the February 10, 1994 ruling of Magistrate Judge Eagan, the FDIC announced that it would not pursue any claims against Schwartz and would withdraw its request to enforce this subpoena. Subsequently, at the October 18, 1994 oral argument of this appeal, the FDIC consented to withdraw the subpoena
 
 
 [2]
 In paragraphs 2, 3, and 12 of the subpoenas, the FDIC seeks from the Directors' spouses all financial statements, credit applications, and records relating to retirement or profit-sharing plans. In paragraphs 4 and 18, the agency seeks all bank records of members of the Directors' immediate families and all records of inheritances and bequests received by family members. These records, as with all documents sought by the subpoenas, are to go back seven years, to August 1987
 
 
 [3]
 We do not agree, however, with the Directors' contention that this intermediate level of scrutiny is applicable to all the FDIC's document requests. It is well settled that, absent countervailing considerations, the standard to be applied to administrative subpoenas duces tecum is that set out in Morton Salt and its progeny. Larouche Campaign, 817 F.2d at 234
 
 
 [4]
 We find too sweeping the FDIC's assertion that "there are no constitutionally protected privacy interests with respect to bank statements, financial statements, and other documents that are prepared or generated in connection with transactions with others." Brief for FDIC at 20. The FDIC purports to find this principle in United States v. Miller, 425 U.S. 435, 96 S.Ct. 1619, 48 L.Ed.2d 71 (1976). In Miller, the Court held that a bank customer had no protected Fourth Amendment interest in the copies of checks and other records retained by his bank, and so could not assert a Fourth Amendment challenge to a grand jury subpoena to the bank for those records. Id. at 440-43, 96 S.Ct. at 1622-24. Contrary to the FDIC's assertion, Miller did not purport to nullify all rights to privacy in financial records; rather, the Court held only that a bank customer could not assert a privacy interest in those records held by the bank. See id. at 440, 96 S.Ct. at 1622-23 (banks' records "are not respondent's 'private papers' " but are "the business records of the banks," in which a customer "can assert neither ownership nor possession"); see also SEC v. Jerry T. O'Brien, Inc., 467 U.S. 735, 743, 104 S.Ct. 2720, 2725-26, 81 L.Ed.2d 615 (1984) (under Miller, "when a person communicates information to a third party ..., he cannot object if the third party conveys that information or records thereof to law enforcement authorities"); United States v. Daccarett, 6 F.3d 37, 50 (2d Cir.1993) (same), cert. denied, --- U.S. ----, 114 S.Ct. 1294, 127 L.Ed.2d 648 (1994)
 
 
 [5]
 At oral argument, the FDIC identified these paragraphs as the only ones not related to the agency's purpose of uncovering asset transfers, and we think that they also could not reasonably be described as relevant to either of the investigation's two remaining purposes--determining liability or determining whether an attachment of assets was warranted
 
 
 [6]
 Congress created the RTC as part of the Financial Institutions Reform, Recovery, and Enforcement Act of 1989, Pub.L. No. 101-73, 103 Stat. 183 (codified as amended at 12 U.S.C. Secs. 1441a, 1811 et seq (West Supp.1994)) ("FIRREA"). As conservator of failed S & Ls, the RTC is granted "the same powers and rights to carry out its duties" that Congress granted the FDIC under 12 U.S.C. Secs. 1821-23. 12 U.S.C. Sec. 1441a(b)(4)(A) (West Supp.1994)
 
 
 [7]
 We find no merit in the Directors' additional contention that we should look to Connecticut law for the appropriate procedure for disclosure of assets. The FDIC's subpoena power is, of course, governed by federal rather than state law. Linde Thomson, 5 F.3d at 1513