In re Subpoena of Roger GIMBEL by FDIC as Receiver for First New York Bank for Business.

Roger GIMBEL, Petitioner–Appellant,

v.

FEDERAL DEPOSIT INSURANCE CORPORATION, Respondent–Appellee.

No. 866, Docket 95–6187.

United States Court of Appeals, Second Circuit.

Argued Oct. 18, 1995.

Decided Feb. 21, 1996.

Arthur M. Handler, New York City (Robert S. Goodman, Eileen P. McCarthy, Burns Handler & Burns LLP, New York City, of counsel), for Appellant.

Lawrence H. Richmond, Federal Deposit Insurance Corporation, Washington, D.C. (Ann S. DuRoss, Assistant General Counsel, Colleen B. Bombardier, Senior Counsel, Federal Deposit Insurance Corporation, Washington, D.C., of counsel), for Appellee.

Before: MESKILL, MAHONEY and WALKER, Circuit Judges.

MESKILL, Circuit Judge:

This is an appeal from a final order of the United States District Court for the Southern District of New York, Martin, J., denying Roger Gimbel's motion to quash a Federal Deposit Insurance Corporation (FDIC) administrative subpoena of Gimbel's personal financial records and granting the FDIC's cross-motion to enforce its subpoena.

## BACKGROUND

Roger Gimbel was a director of the First New York Bank for Business (FNYBB) from 1986 until 1992 when the bank failed. The FDIC took over as receiver for the failed

bank and through an administrative subpoena *duces tecum* seeks to determine the potential liability of Gimbel to FNYBB/FDIC and his ability to pay any judgment obtained. Gimbel argues that the FDIC subpoena must be quashed because it lacks the requisite articulation of suspicion of liability required by the Fourth Amendment, and because it seeks information irrelevant to the stated purposes of the FDIC investigation of him and thus is outside the FDIC's statutory authority. The district court found that the FDIC made an "adequate showing" to support its subpoena. We have jurisdiction pursuant to 28 U.S.C. § 1291.

The FDIC subpoena of Gimbel's personal records instructed Gimbel to provide the FDIC the following:

1. Your current financial statement and all financial statements listing your assets and liabilities, (alone or with others).

2. All credit applications submitted by you, alone or with others, to any depository institution or any other person or entity.

3. All records prepared, generated, or received on or after June 8, 1995, referring or relating to any account in any depository institution maintained by you or any member of your immediate family, or over which you or they have exercised control, or as to which you or they are or were a signatory, or in which you or they had or have a financial interest, including but not limited to: (a) checking and savings account statements; (b) records of loans made or received; (c) records of certificates of deposit and other time deposit items purchased or redeemed; (d) records of safe deposit boxes; (e) cancelled checks.

4. All records prepared, generated, or received on or after June 8, 1995, referring or relating to the source and amount of any income received by you or on your behalf, including but not limited to all wages, salary, commissions, bonuses, interest and dividend payments, and any other form of income received by you.

5. All Federal, state and local tax returns filed by you either individually or jointly with another, along with all forms and schedules filed with such returns.

6. All records prepared, generated, or received on or after June 8, 1995, referring or relating to stocks, bonds, securities or other investments currently owned by you individually or with others, including but not limited to any statements showing their value.

7. All documents that reflect, refer or relate to any financial, real or personal property transactions in which you, or anyone acting on your behalf, or under your control or influence, have been involved, (except as the attorney, employee or agent of another party on transactions in which you had no personal interest), having a value of $5,000 or more, per person or organization per year, including, but not limited to, the following:

 a. all real and personal property purchases, sales or transfers, with or without consideration;

 b. all trust participations;

 c. mortgages, trusts or other liens on security interests obtained or supplied on any third party;

 d. lawsuits; and

 e. repossessions and returns.

8. All documents referring or relating to any transfer of assets exceeding $5,000 to any entity, account, place or person located outside the United States of America.

9. All records referring or relating to any interest you hold in any real[,] personal or other type of property exceeding $5,000 in value not described above.

10. All policies which insure you against liability, unless the policy expressly excludes all coverage for directors and officers. Examples of policies which may be required to be produced include D & O insurance of a failed institution, insurance covering you as a director or officer of a corporation other than the failed institution, comprehensive general liability (CGL) policies, homeowner's policies, personal umbrella policies.

## DISCUSSION

As we noted in *In re McVane*, 44 F.3d 1127 (2d Cir.1995), the statute that empowers the FDIC to issue subpoenas "places few restrictions on that power." *Id.* at 1134. The statute provides that:

> The Corporation may, as conservator, receiver, or exclusive manager and for purposes of carrying out any power, authority, or duty with respect to an insured depository institution (including determining any claim against the institution and determining and realizing upon any asset of any person in the course of collecting money due the institution), exercise any power established under section 1818(n) of this title.

12 U.S.C. § 1821(d)(2)(I)(i). Section 1818(n) provides that the FDIC shall have the power to, among other things, issue, revoke, and quash subpoenas *duces tecum*. 12 U.S.C. § 1818(n). The only statutory limit on the subpoena power of the FDIC is that the subpoenas be issued " 'for purposes of carrying out any power, authority, or duty with respect to an insured depository institution.' " *McVane*, 44 F.3d at 1134 (quoting § 1821(d)(2)(I)(i)).

Limitations on the FDIC's sweeping power to subpoena the personal financial records of the former directors and officers of failed savings and loans[1] come from two sources. First, courts have interpreted the FDIC's seemingly unlimited grant of authority to issue subpoenas as requiring a preliminary showing of suspicion of liability of the subpoena respondent for certain inquiries. For instance, in *RTC v. Walde*, 18 F.3d 943 (D.C.Cir.1994), the District of Columbia Circuit held that Congress did not authorize the FDIC to subpoena personal financial records of directors for the purpose of determining the cost-effectiveness of litigation, unless the FDIC could articulate a suspicion of liability. *Id.* at 949; *McVane*, 44 F.3d at 1140. A second limitation on the FDIC's subpoena power is, of course, the Fourth Amendment's prohibition of unreasonable searches. In *McVane*, we held that the Fourth Amendment would be offended by the enforcement of a FDIC subpoena for the personal financial records of family members of the directors of a failed bank unless the FDIC could show a need for those records beyond their mere relevance to the FDIC investigation. *McVane*, 44 F.3d at 1138.

■ Absent one of these limitations, the FDIC need only satisfy the statutory standard for the enforcement of administrative subpoenas. Accordingly, the FDIC must show that its investigation is being conducted pursuant to a legitimate purpose, that the inquiry is relevant to that purpose, that the information is not already within the FDIC's possession and that the proper procedures have been followed. *United States v. Powell*, 379 U.S. 48, 57–58, 85 S.Ct. 248, 254–55, 13 L.Ed.2d 112 (1964).

### A. The Fourth Amendment Claim

■ While the Fourth Amendment's prohibition against unreasonable searches applies to administrative subpoenas, the Supreme Court has held that such subpoenas are, at best, "constructive searches." *Oklahoma Press Pub. Co. v. Walling*, 327 U.S. 186, 202–08, 66 S.Ct. 494, 502–05, 90 L.Ed. 614 (1946). As such, administrative subpoenas do not require full probable cause for enforcement. *United States v. Morton Salt Co.*, 338 U.S. 632, 70 S.Ct. 357, 94 L.Ed. 401 (1950). The *Morton Salt* Court held that as long as subpoenaed information was "reasonably relevant to the agency investigation," "not too indefinite" and "within the authority of the agency," the Fourth Amendment was not offended. *Id.* at 652, 70 S.Ct. at 368–69.

Gimbel argues that because *Morton Salt* involved an administrative subpoena for corporate records, its "reasonable relevance" standard cannot be the Fourth Amendment standard applicable to the FDIC's subpoena of his personal records. Gimbel relies on language in *Morton Salt* itself. The Supreme Court stated, in the context of a challenge to a Federal Trade Commission order requiring the Morton Salt Company to file

---

1. For a discussion of the course of a typical FDIC investigation, *see* James T. Pitts, *et al., FDIC/RTC Suits Against Bank and Thrift Officers* and Directors—*Why Now, What's Left?*, 63 Fordham L.Rev. 2087, 2094–95 (1995).

reports with it, that although corporations have certain privacy interests, they "can claim no equality with individuals in the enjoyment of a right to privacy." *Id.* at 652, 70 S.Ct. at 368. Thus, the argument goes, if a subpoena for corporate records requires a showing of reasonable relevance, then a subpoena for an individual's personal financial records must require some higher showing. This argument was recently accepted by a divided panel in *Parks v. FDIC,* No. 94–2262, 1995 WL 529629 (1st Cir. Sept. 13, 1995), but that opinion was subsequently vacated and rehearing *in banc* granted. Order of Court, Nov. 20, 1995. Appellant had never relied on *Parks* as binding authority on this appeal, but rather argued that the holding in *Parks* is consistent with our decision in *McVane.* Although *Parks* was vacated, we will address the panel and dissenting opinions therein in analyzing Gimbel's claims. The *Parks* majority stated that for enforcement of an administrative subpoena for privately held personal financial records, the Fourth Amendment requires that the agency "articulate an individualized suspicion of wrongdoing by the petitioner." *Parks,* 1995 WL 529629, at *8.

We addressed that same question in *McVane,* 44 F.3d 1127, and recognized and interposed both statutory and constitutional limitations on the FDIC's power to subpoena personal financial records. *McVane* involved an FDIC subpoena for financial records of directors of a failed bank and the records of the directors' families. Much of our discussion focused on the portions of the subpoena relating to the financial records of the directors' family members. *Id.* at 1137–39. In connection with that discussion, we recognized, as the Supreme Court did in *Morton Salt,* that the Fourth Amendment generally affords more protection to individuals than corporations, and we held that persons who are not targets of investigations are generally accorded even greater protection from administrative subpoenas. *Id.* at 1137. Thus we held that those portions of the subpoena relating to the personal financial records of the family members of directors required "some showing of need for the material sought beyond its mere relevance to a proper investigation." *Id.* at 1138 (quoting *Federal*

*Election Comm'n v. Larouche Campaign,* 817 F.2d 233, 234 (2d Cir.1987) (per curiam)). We *rejected* the directors' contention, however, that *all* of the FDIC's requests were subject to this "intermediate level of scrutiny." *Id.* at 1138 n. 3. Rather, we noted that "[i]t is well settled that, absent countervailing considerations, the standard to be applied to administrative subpoenas *duces tecum* is that set out in *Morton Salt* and its progeny." *Id.*

Appellant argues that this last proclamation in *McVane* is dictum, and thus there is an open question in this Circuit as to whether the "reasonable relevance" standard of *Morton Salt* applies to administrative subpoenas for the privately held personal financial records of actual targets. Gimbel claims that *McVane* 's holding is limited to the issue of subpoenas for family members' information. The FDIC claims that *McVane* footnote 3 is a holding and thus controlling.

The subpoena at issue in *McVane* requested the financial records of the actual directors as well as those of their families, so the issue of the enforceability of the FDIC subpoena of the directors' records was properly and squarely before the *McVane* panel. Our joining the D.C. Circuit in adopting a stricter standard when evaluating FDIC subpoenas seeking directors' financial records solely for the purposes of determining which of the directors are worth suing, *id.* at 1139–40 (citing *Walde,* 18 F.3d at 949), does not mean that we did not consider the propriety of the other FDIC purposes and the appropriate showing required. We held in *McVane* that to enforce subpoena provisions intended only to determine the cost-effectiveness of bringing suit, the FDIC must "articulate specific grounds for its suspicion of liability," and we held that the FDIC had met that standard. *McVane,* 44 F.3d at 1140.

We also affirmed the enforcement of the director-related provisions. *Id.* at 1141. Thus, we necessarily found the director-related portions of the subpoena to be sufficient under the Fourth Amendment. In other words, in holding that only the portions of the subpoena that sought the records of family members and the portions that sought

only cost-effectiveness information would be held to a higher standard than *Morton Salt*, we implicitly applied *Morton Salt*'s "reasonable relevance" standard to the remaining portions of the subpoena. Thus footnote 3 of *McVane*, indicating that *Morton Salt* applies to subpoenas for directors' personal financial records, is not dictum and is controlling on this issue.

Even if we believed that *McVane* did not control this case, we are not persuaded by the majority's reasoning in *Parks* that *Morton Salt*'s reasonable relevance standard cannot apply to administrative subpoenas for directors' personal financial records. *Parks*, 1995 WL 529629, at *5. The *Parks* majority claimed to exercise simple logic and suggested that we missed the boat in *McVane* by relying on *Walde*, 18 F.3d 943, and, like the *Walde* Court, by failing to distinguish between subpoenas for the financial records of individuals and those of corporations. *Parks*, 1995 WL 529629, at *5. The *Parks* majority reasoned that if corporations are protected by *Morton Salt*'s reasonable relevance standard, and if individuals are entitled to greater protection than are corporations, then there must be a Fourth Amendment standard stricter than reasonable relevance where personal financial records are subpoenaed. *Parks*, 1995 WL 529629, at *8.

Although this argument has surface appeal, it does not withstand careful scrutiny. We agree with dissenting Judge Selya that the *Parks* majority relied too heavily on the distinction between corporate and personal financial affairs. *Parks*, 1995 WL 529629, at *10 (Selya, *J.*, dissenting). Our holding in *McVane* recognized the Supreme Court's teachings that corporations are not entitled to the same level of Fourth Amendment protection that is afforded individuals, but also recognized that courts have continued to apply the reasonable relevance test to administrative subpoenas for personal financial records. *See McVane*, 44 F.3d at 1137; *see also Walde*, 18 F.3d at 946–48; *SEC v. Kaplan*, 397 F.Supp. 564, 567, 570 (E.D.N.Y.1975).

Although the *Parks* majority claimed that the Supreme Court had never applied the *Morton Salt* standard to a subpoena for the financial records of an individual, *Parks*, 1995

WL 529629, at *5, Judge Selya correctly noted that the Supreme Court did just that in *Ryan v. United States*, 379 U.S. 61, 85 S.Ct. 232, 13 L.Ed.2d 122 (1964). In *Ryan*, the Court enforced an IRS subpoena of a taxpayer's personal financial records for the reasons stated in *United States v. Powell*, 379 U.S. 48, 85 S.Ct. 248, 13 L.Ed.2d 112 (1964), decided the same day. *Ryan*, 379 U.S. at 62, 85 S.Ct. at 233. *Powell* held that *Morton Salt*'s reasonable relevance standard, not probable cause, was the proper standard under which to review an IRS subpoena of corporate tax records. Thus, the *Ryan* Court, by enforcing the IRS subpoena for the reasons stated in *Powell*, held that the *Morton Salt* standard was also proper in the *personal* records context.

We also agree with Judge Selya that the language in *Morton Salt* and *Oklahoma Press*, indicating that corporations enjoy less protection than do individuals under the Fourth Amendment is, at least in the context of administrative subpoenas, representative of an era that was still coming to terms with the modern regulatory state. *Parks*, 1995 WL 529629, at *10 (Selya, *J.*, dissenting). The decisions of the Supreme Court in *Morton Salt* and *Oklahoma Press* reveal a Court struggling to reconcile the Fourth Amendment and the emerging, post-war regulatory state, and finding some additional support for its decision in the fact that the party invoking the Fourth Amendment was a corporation. The *Powell–Ryan* line of cases removed many of the chains that bound agency investigations. *See, e.g., United States v. McAnlis*, 721 F.2d 334, 336 (11th Cir.1983) (applying *Powell* standard to IRS summons for personal tax records), *cert. denied*, 467 U.S. 1227, 104 S.Ct. 2681, 81 L.Ed.2d 877 (1984); *United States v. Roundtree*, 420 F.2d 845, 851 (5th Cir.1969) (holding that "we are satisfied that the Commissioner meets the standard of probable cause when he meets the requirements of *Powell*").

The Court's decisions in *Powell* and *Ryan* evince a more modern view of the regulatory state, and one that recognizes that Congress may authorize administrative agencies, such as the IRS and Federal Trade Commission and, as in this case, the FDIC, to investigate

suspected wrongdoing in their respective fields of expertise. These agencies, when authorized by Congress, may utilize their subpoena power to obtain information that is relevant to a legitimate area of inquiry. Obviously, this does not mean that the FDIC's congressional authorization to investigate bank failures and issue subpoenas in furtherance of its investigation insulates it from Fourth Amendment scrutiny. We recognize, however, that the Supreme Court, in *Oklahoma Press*, held that the Fourth Amendment standard in the context of agency subpoenas is ultimately one of reasonableness, *Oklahoma Press*, 327 U.S. at 208, 66 S.Ct. at 505, and that the Court, through its decisions in *Powell* and *Ryan*, has held that, as Judge Selya put it, "administrative subpoenas seeking [financial] records are per se reasonable as long as they are lawfully authorized, relevant, sufficiently specific, and procedurally unblemished." *Parks*, 1995 WL 529629, at *11 (Selya, *J.*, dissenting); *Powell*, 379 U.S. 48, 85 S.Ct. 248, 13 L.Ed.2d 112; *Ryan*, 379 U.S. 61, 85 S.Ct. 232, 13 L.Ed.2d 122. We agree with Judge Selya that there is no reason to categorically restrict this standard to *corporate* financial records. *Parks*, 1995 WL 529629, at *11.

The underlying rationale in affording corporations a lesser degree of Fourth Amendment protection than normally accorded to individuals is that a corporation, as a creature of the state, born of the law of the state, and whose very existence is defined by the state, has limited grounds for a "reasonable expectation of privacy," *Katz v. United States*, 389 U.S. 347, 360, 88 S.Ct. 507, 516, 19 L.Ed.2d 576 (1967) (Harlan, *J.*, concurring), in its corporate financial records. *Morton Salt*, 338 U.S. at 651–52, 70 S.Ct. at 368–69. Similarly, individuals, by the nature of their chosen profession, might not hold a "reasonable expectation of privacy" in certain areas of their personal affairs.[2]

■ As we stated in *McVane*, "absent countervailing considerations, the standard to be applied to administrative subpoenas *duces tecum* is that set out in *Morton Salt* and its progeny." *McVane*, 44 F.3d at 1138 n. 3. The countervailing considerations we referred to in *McVane* are those that arise where, based on the surrounding circumstances, a subpoena respondent maintains a reasonable expectation of privacy in the materials sought by the subpoena. Unless a reasonable expectation of privacy of a greater magnitude than at least that held by an individual taxpayer in his or her personal financial records is demonstrated, *Ryan*, 379 U.S. 61, 85 S.Ct. 232, 13 L.Ed.2d 122 (enforcing subpoena for taxpayer's personal financial records on showing of relevance), the Fourth Amendment does not require any showing beyond the reasonable relevance of the materials sought.

Such a situation arose where the FDIC subpoenaed the personal financial records of the family members of the directors of a failed bank in *McVane*. We found that the subpoena respondents retained a reasonable expectation of privacy that merited a more stringent standard than reasonable relevance. *McVane*, 44 F.3d at 1137–38.

In analyzing the reasonableness of the family members' expectations of privacy, we stated that non-parties will generally be accorded more protection from sweeping administrative subpoenas under the rationale that "[i]ndividuals ... who do not participate in corporate matters that might reasonably become the subject of government inquiry have a greater 'reasonable expectation of privacy' in their personal financial affairs than do those individuals who do participate in such matters." *McVane*, 44 F.3d at 1137 (citations omitted) (quoting *Katz*, 389 U.S. at 360, 88 S.Ct. at 516 (Harlan, *J.*, concurring)). The family members in *McVane* had no busi-

---

**2.** *See Vernonia School Dist. 47J v. Acton*, — U.S. —, —, 115 S.Ct. 2386, 2393, 132 L.Ed.2d 564 (1995) ("Somewhat like adults who choose to participate in a 'closely regulated industry,' students who voluntarily participate in school athletics have reason to expect intrusions upon normal rights and privileges, including privacy.") (citing *Skinner v. Railway Labor Executives Ass'n*, 489 U.S. 602, 627, 109 S.Ct. 1402, 1418–19, 103

L.Ed.2d 639 (1989) (holding constitutional a statute making railroad workers subject to urinalysis without warrant or individualized suspicion), and *United States v. Biswell*, 406 U.S. 311, 316, 92 S.Ct. 1593, 1596, 32 L.Ed.2d 87 (1972) (upholding statutorily authorized search of pawn shop licensed to sell firearms made without warrant or individualized suspicion)).

ness relations with the director to whom they were related. *Id.* at 1138. To the contrary, the relationships were purely personal. We stated that "[a] person does not involve him or herself in matters forseeably the object of agency inquiry simply by being a member of another's family." *Id.* Thus we held that "[c]onjugal or familial association with a corporate participant does not, by itself, strip an individual of his or her expectation of privacy," *id.*, and we required the FDIC to make a showing of need for the materials beyond their mere relevance. *Id.*

We find no comparable "reasonable expectation of privacy" here. In fact, the appellant in this case is the type of person, by nature of his profession, who should least expect his personal financial records to remain private. Indeed the Supreme Court has noted that "adults ... who choose to participate in a 'closely regulated industry' ...: have reason to expect intrusions upon normal rights and privileges, including privacy." *Vernonia School Dist. 47J v. Acton,* —— U.S. ——, ——, 115 S.Ct. 2386, 2393, 132 L.Ed.2d 564 (1995).

As every bank director should reasonably be aware, federal and state regulation of the banking industry is intense. Like an ordinary public corporation, the government regulates the relations between the directors and the shareholders. Unlike many other industries, though, in banking, there is additional and extensive governmental regulation of the relationship between banks and their depositors, including government insurance of the funds deposited. In fact, the history of the industry, since its collapse in the 1930s and subsequent regulation,[3] should indicate to any persons assuming the responsibilities of directorship that they will constantly be dealing with the government and with government inquiries. These conditions indicate that Gimbel, as a person who was involved in "matters that were likely to be the object of governmental inquiry," *McVane,* 44 F.3d at 1137 (quoting *United States v. Arthur Young & Co.,* 677 F.2d 211, 216 (2d Cir.1982), *aff'd in part and rev'd in part on other grounds,*

465 U.S. 805, 104 S.Ct. 1495, 79 L.Ed.2d 826 (1984)), may not now claim that he holds an expectation of privacy of a level demanding a standard more demanding than the *Morton Salt* standard.

Absent circumstances not present in this case, the Fourth Amendment requires no showing beyond the standard articulated in *Morton Salt* where the FDIC seeks the personal financial records of a director of a failed bank. *McVane,* 44 F.3d at 1138 n. 3. Provided that the investigation by the FDIC of the former directors of the failed First New York Bank for Business is within its statutory authority, the FDIC need not articulate an individualized suspicion of wrongdoing to obtain enforcement of its administrative subpoena *duces tecum* as suggested by Gimbel. Rather the FDIC need only make a showing that the materials sought are, in its view, "reasonably relevant" to its investigation. *Morton Salt,* 338 U.S. at 652, 70 S.Ct. at 369.

### B. *Application*

■■■ We now turn to the question of whether the materials sought by the FDIC subpoena satisfy the *Morton Salt* standard as interpreted by us in *McVane.* Applying *McVane,* we must determine only if "the inquiry is within the authority of the [FDIC], the demand is not too indefinite and the information sought is reasonably relevant." *McVane,* 44 F.3d at 1135 (quoting *Morton Salt,* 338 U.S. at 652, 70 S.Ct. at 369) (emphasis omitted). In *McVane,* after instituting an intermediate level of review for the records of the family members of the target, we applied the *Morton Salt* reasonable relevance inquiry with one further deviation. For records sought solely to determine a director's net worth for the purpose of determining the cost-effectiveness of bringing suit, the FDIC must set forth "at least an articulable suspicion that [the director] is liable to the failed institution." *Id.* at 1139 (quoting *Walde,* 18 F.3d at 949) (emphasis omitted). This requirement is not grounded in the Fourth Amendment, but rather in the grant

---

**3.** *See* Michael P. Battin, Note, *Bank Director Liability Under FIRREA,* 63 Fordham L.Rev. 2347, 2370–77 (1995) (tracing the beginnings and de-

velopment of government regulation of the banking industry from the 1930s to the present).

of statutory authority to the FDIC to issue subpoenas. *Id.* 44 F.3d at 1140 ("Congress . . . did not thereby 'intend[ ] to authorize the [FDIC] to browse among the private papers of citizens whose only sin had been to serve as officers or directors of defunct S & Ls.' ") (quoting *Walde*, 18 F.3d at 949).

 The initial determination of what information is reasonably relevant is left to the investigating agency. The district court must enforce the subpoena unless the agency's determination of relevancy is "obviously wrong," *McVane*, 44 F.3d at 1135 (quoting *Walde*, 18 F.3d at 946), and we must accept any determinations made by the district court that are not clearly erroneous. *Id.* Thus wide latitude is given to the FDIC in determining relevancy. Gimbel challenges the relevancy of the subpoenaed materials as it applies to the four stated purposes of the Order of Investigation.

 The FDIC Order of Investigation stated four purposes of its investigation. The stated purposes were to determine (1) whether the former FNYBB directors may be liable as a result of their actions and/or failures to act, (2) whether pursuit of litigation against the directors would be cost-effective in light of the directors' ability to pay any judgment obtained, (3) whether the FDIC should seek to avoid any asset transfers by the directors, and (4) whether the FDIC should attach the directors' assets. If each provision of the subpoena seeks information reasonably relevant to purposes one, three or four, we need not reach the question of the propriety of information as it relates to purpose two. As we stated in *McVane*, "[e]ven if the Directors can show that one purpose underlying the subpoenas is improper, enforcement of the subpoenas is called for nonetheless so long as other, proper purposes exist." *Id.* at 1139.

The showing made by the FDIC in support of its subpoena *duces tecum* consisted of an affidavit offered by an FDIC investigator, David A. Leahy. The affidavit stated, in pertinent part:

8. I have reviewed certain losses sustained by the Bank resulting from insider loans approved and/or ratified by certain directors of the F[NY]BB, including Mr. Gimbel. The insider loans have resulted in losses of approximately 40 million dollars to the Bank. These loans were originated, approved and/or ratified by the directors after the Bank had received regulatory warnings regarding its loan practices.

9. The extent and nature of the losses sustained by the Bank on the insider loan transactions suggest that the directors, including Mr. Gimbel, were grossly negligent and violated their fiduciary duty of loyalty to the Bank by approving and/or ratifying the insider loans.

. . . .

11. The records sought by the subpoena *duces tecum*, largely current financial documents, are relevant to the investigation directed by the Order of Investigation, and are not already in the possession of the FDIC. The FDIC's receipt and examination of these documents is necessary to allow the FDIC to determine whether Mr. Gimbel may be liable as a result of his actions or inaction; whether Mr. Gimbel may have transferred assets under circumstances in which the FDIC should attempt to avoid the transfers; whether the FDIC should seek to attach any assets of Mr. Gimbel and; whether any litigation initiated by the FDIC against Mr. Gimbel would be cost-effective.

We address Gimbel's challenges to the showings made by the FDIC regarding the relevance of his personal financial records to each of the FDIC's stated purposes in turn.

### 1. *Determining Gimbel's Liability*

Gimbel claims that because he never received any personal loans from FNYBB, his personal financial records can have no relevance to the FDIC's investigation of improper insider loans. FDIC correctly points out that there are many ways a director can benefit from approving improper loans, not all of which involve direct loans to the director. For instance, a kickback scheme could be uncovered based on payments to Gimbel from those who may have received improper loans. Under the *McVane* standard, no individualized suspicion need be advanced by the FDIC, rather the agency may

request the information merely to assure themselves the law has not been broken. *McVane*, 44 F.3d at 1135 (analogizing the agency subpoena power to that of grand juries). The FDIC's desire to assure itself that Gimbel was engaged in no wrongdoing is sufficient under *McVane* and *Morton Salt.* This sweeping power is what led the *Parks* majority to demand an "articulable and individualized suspicion" of wrongdoing before enforcing the subpoena. While we understand the *Parks* majority's concerns regarding the vesting of such broad power in the FDIC, Congress has given it to the FDIC, and its proper exercise is not unreasonable under the Fourth Amendment.

### 2. Whether to Avoid Asset Transfers

Appellant claims that the FDIC's authority to seek his records for purposes of determining whether to avoid certain asset transfers is limited to obtaining information regarding assets wrongfully obtained from FNYBB on the grounds that the FDIC's statutory power to avoid asset transfers is limited to those transfers involving assets "wrongfully obtained" from FNYBB. The District of Columbia Circuit rejected this argument in *Linde Thomson Langworthy Kohn & Van Dyke v. RTC*, 5 F.3d 1508 (D.C.Cir.1993), based on the plain language of the authorizing statute, 12 U.S.C. § 1821(d)(17)(A). The statute reads, in pertinent part:

> The [FDIC] ... may avoid a transfer of *any interest* of an institution-affiliated party ... that was made within 5 years of the date on which the [FDIC] was appointed ... receiver if such party ... made such transfer ... with the intent to hinder, delay, or defraud the [FDIC].

12 U.S.C. § 1821(d)(17)(A). The statute clearly authorizes the FDIC to avoid any transfer made by Gimbel with the intent to defraud the FDIC. Thus, the FDIC's investigative powers extend to any transfer. *Linde Thomson*, 5 F.3d at 1517. Gimbel's reliance on the statements of Congressman Schumer to the effect that the statute is intended to allow the FDIC to freeze assets "wrongfully obtained," 136 Cong.Rec. E3684–02 (1990) (remarks by Representative Schumer), does not justify a departure from the plain language of the statute, which authorizes the avoidance of any asset transfer intended to hinder the FDIC's investigation.

### 3. Whether to Attach Assets

Gimbel argues that because the FDIC has no authority to freeze his assets before proving to a court that there is a likelihood of the FDIC's success on the merits, that FDIC has no right to investigate whether to freeze his assets until a preliminary finding of liability has been made. The District of Columbia Circuit in *Walde* considered the propriety of the FDIC's stated purpose of making a determination whether to freeze McVane's assets and held that it was proper for the FDIC to investigate the possibility of a freeze even though no specific allegation of wrongdoing had been made. *Walde*, 18 F.3d at 947. The *Walde* Court stated that "[t]o require the RTC to make such a preliminary determination of liability before subpoenaing documents ... would seriously hamper the agency's ability to locate and save a failed institution's assets." *Id.; RTC v. Greif*, 906 F.Supp. 1446, 1454 (D.Kan.1995). Gimbel's records are reasonably relevant to the FDIC's proper stated purpose of determining whether to freeze his assets. The FDIC's authorizing statute gives it the power to attach assets, and the FDIC included such purpose in its Order of Investigation. Clearly, the asset information sought is directly related to the decision whether to attach assets. *Linde Thomson*, 5 F.3d at 1517.

### 4. Cost–Effectiveness of Bringing Suit

*McVane* set a higher standard that the FDIC must meet in justifying subpoenas issued solely to determine the cost-effectiveness of litigation against a target. *McVane* held that the agency must "articulate specific grounds for its suspicion of liability." *McVane*, 44 F.3d at 1140. In *McVane*, an FDIC inspector submitted an affidavit declaring that the Bank in question lost $9 million due to improper insider loans that were originated and approved by the directors after they had been warned by regulatory agencies about their practices. The inspector further declared that another director (not McVane) had transferred millions of dollars worth of real estate to family mem-

bers after the Bank failed. *Id.* We held that this was "more than sufficient to support the FDIC's request for information concerning [all] the Directors' net worth." *Id.*

The facts in this case are similar to those presented in *McVane.* Inspector Leahy declared many of the same grounds for suspicion in this case, namely, that the board of directors originated and approved improper insider loans that resulted in losses of $40 million, that these loans were approved after warnings against such practices were received from regulatory agencies, and that the nature of the losses suggest that the directors were grossly negligent in their actions and/or failures to act. The lack of an allegation in this case that a director transferred large amounts of real estate to a family member does not distinguish *McVane* in any meaningful way. It might be argued that one director's transfer of millions of dollars in real estate to family members suggesting the possibility of widespread director misconduct distinguishes *McVane* from the case at hand. This argument is not persuasive. The allegations of improper approval of loans by FNYBB directors are sufficient to cast suspicion of impropriety on all of the directors even without the asset transfer alleged in *McVane.* The lack of the additional allegation of wrongdoing present in *McVane* is not enough to remove this case from *McVane*'s authority. That standard was met here.

## CONCLUSION

For the reasons stated above, the judgment of the district court is affirmed.